THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EDWIN CLAY, Defendant-Appellant.

First District (4th Division)    No. 80-988

Opinion filed July 23, 1981.

James J. Doherty, Public Defender, of Chicago (John M. Kalnins, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Joel A. Stein, and Bruce Rose, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

Defendant, Edwin Clay, was convicted by a jury of burglary and possession of burglary tools (Ill. Rev. Stat. 1977, ch. 38, pars. 19—1 and 19—2) and sentenced to an extended term of 14 years in the penitentiary. On appeal he contends that the court erred in denying his motion to suppress and that he was denied his constitutional right to a speedy trial.

Defendant filed a motion to suppress the statement which he gave police following his arrest alleging that the statement was involuntary because it was obtained as a result of physical coercion. Prior to the hearing defendant was unable to specify the officers involved in the alleged beating, but defense counsel informed the court that they were among those named on defendant's statement and any others who might have been in the room where the alleged beating took place.

Three police officers testified that they were in the room when defendant made his statement. Investigator Thomas Rennie testified that he was present at 24th Street and the Dan Ryan Expressway at 5:05 a.m. on July 16, 1978, when defendant and two others were arrested. He placed defendant into an unmarked squad car and observed that he had a black eye. He advised defendant of his constitutional rights, and defendant indicated that he understood.

The officer next spoke with defendant in a second-floor interview room at the Area 6 police station where defendant was handcuffed to a ring in the wall. Rennie left the room to get typing paper and conferred outside the door with Investigators Moran and Biebel. He reentered the room a few minutes later with Moran, uncuffed the defendant and informed him again of his constitutional rights. Defendant indicated that he understood these rights and then waived them. Biebel entered the room a few minutes later.

Rennie then typed up the statement given by defendant through a question-and-answer format. He stated that the interview lasted about 20 minutes and that three officers were present. When the statement was completed, defendant looked at it, initialled and signed it. He stated that he did not promise anything to the defendant, did not threaten or beat him and did not see anyone else beat him. He did not believe that anyone

entered the room in the short time that he left to get the paper, and defendant declined his offer of medical attention.

Rennie also identified a picture of defendant which he thought was taken after the interview and accurately depicted defendant's appearance at that time. He noted there was a small red mark on defendant's arm, but he did not recall whether defendant had that mark when he entered the room.

Investigator Moran stated that he was also assigned to investigate an alleged burglary involving the defendant. He noticed defendant's black eye when defendant arrived at the station. He entered the interview room about 6:15 a.m. where defendant was handcuffed to a ring in the wall. He stated that he was in the room for about 20 minutes and that he, Rennie and Biebel were the only ones who entered the room during that time. He also denied beating or threatening the defendant, and did not see anyone else do so. Moran further stated that the photo of defendant was taken before he entered the lockup, and that it was an accurate portrayal of the way he looked after the interview.

Investigator Biebel stated that he had a conversation with Officer Rennie outside the second-floor interview room and entered the room about 5 minutes later. Rennie was conversing with the defendant and both were seated at a table. This interview lasted about 20 minutes, after which defendant read and signed the statement. He also denied threatening or beating defendant and did not see anyone else engaged in these activities. He noticed that defendant had a black eye when he first saw him at the scene of the arrest, and that the picture of defendant taken after the interview accurately depicted defendant's condition at that time.

Defendant testified that he was arrested while riding in a car on the Dan Ryan Expressway; he did not converse with any of the officers at the scene. He was then transported to the police station in a police vehicle and arrived there about 6 a.m. He was taken to a small room by two officers and his hands were cuffed behind his back. When they entered the room, the officer who was walking ahead of him threw down a card and said, "Here's your rights." He then turned around and hit defendant in the eye. More blows followed, but defendant did not know who hit him. He stated that at one point there were four to six officers in the room and that he knocked over a chair which broke beneath him. He also stated that he was kicked while he was on the floor and was eventually examined by a paramedic when he was processed at the Cook County jail.

On cross-examination, he stated that he believed that Officer Nickeas was the one who struck him in the eye, but that he did not know who was behind him. He said that the other blows came from all directions and that he was kicked numerous times in the stomach, back and chest. He was also pulled up from the floor by his neck and Nickeas choked him so

that he had trouble breathing. This beating lasted about 30 minutes, after which one of the officers told him that a statement was going to be prepared and that he was going to sign it. He did not recall who made this statement, but that Rennie was the only person in the room when the statement was being typed; defendant remained handcuffed with his hands behind his back.

Defendant further stated that he signed the statement in accordance with the instructions given by the officer but he did not read it beforehand. His photo was taken thereafter. He did not recall telling Rennie that: "I walked into the basement and hit my eye on the wire. I saw stars and thought I knocked my eye out," nor did he tell police there was something hanging from the ceiling "like a rod." He did not seek medical attention until he was processed at the jail and told the paramedic that the police had beaten him. He was examined by a doctor the following day.

The paramedic, who examined defendant at the jail 36 hours later, also testified for the defense. He stated that defendant had a black eye, bruises on his arm and a red mark on his chest. He gave defendant a cold pack for his eye and completed a routine report of the examination. He admitted on cross-examination that he had no independent recollection of his examination of defendant and was relying on his report. The report showed that defendant had a black eye and two bruises about the size of a quarter on his right arm around the elbow, but there were no entries indicating injuries to defendant's stomach, chest or back. He viewed the photo of defendant which showed the area of the arm where he observed the bruises. He stated that on the photo there appeared to be a scratch on defendant's arm where he observed the bruises.

Officer Moran testified in rebuttal that he observed defendant enter the interview room about 5:45 a.m. He remained outside the interview room and did not leave the area until he entered the room himself. During this period he did not observe anyone other than himself, Rennie and Biebel enter the room.

Following the arguments of counsel, the motion was denied and jury selection began. During this process defendant requested the court to dismiss his case, alleging that he had not been brought to trial within 120 days. He argued that he had never agreed to the continuances which were entered with the acquiescence of his counsel, inferring that these delays should not be attributed to him. This motion was also denied.

At trial the State's evidence established that defendant and two companions were under police surveillance for about 3 hours on the morning of July 16, 1978. Police had received a call from an informant that defendant was planning the burglary of a north side lounge. Defendant's activities were observed by seven officers who communicated with each other via walkie-talkie. The officers saw defendant riding

in the back of a 4-door green Comet with Indiana license plates accompanied by two other men. He exited the vehicle at various times and milled about, peered into and walked around the rear entrances of three different taverns.

Defendant and his companions then proceeded to the south side and were followed by the surveillance team. They parked in front of a tavern at 18th Street and Canalport, and defendant stepped out of the car, looked into the windows of the tavern located at that address and returned to the car which then pulled around the corner. Defendant exited the vehicle with a tire iron in his hand and was observed entering the gate by Officers Nickeas and Jones who had taken up positions on the porch of a building located in back of the one housing the tavern. Nickeas observed him go down the stairwell which leads to the basement door. He was unable to see him at this point, but heard wood breaking and the door being pried open. Defendant emerged about 15 minutes later and was observed exiting the stairwell with the tire iron in his hand. He left through the same gate he entered. When Nickeas and Jones were advised that defendant was gone from the area, they entered the basement. Nickeas observed that the door had been pried open and the door and the lock area were damaged. They also saw wood chips on the floor of the basement and the ceiling above it had been tampered with. The officers informed the others of this situation and left the basement.

Defendant reentered the car where he was observed by officers stationed outside of the tavern. They followed the car south on the Dan Ryan, where they arrested the three occupants and transported them to the police station. Rennie stated that he recovered a tire iron from the floor of the back seat of the car where defendant was sitting.

Officers Biebel and Moran returned from the scene of the arrest to the tavern where they met the owner. Nickeas remained at the tavern for about one-half hour and then proceeded to Area 6 headquarters with Jones and started the paper work. Rennie gave him the tire iron which he prepared for inventory, but did not submit to the crime lab.

Gilbert Smith testified that he owned the building at 1918 South Canalport, and that he did not give defendant permission to enter on July 16, 1978. He closed the tavern about 2:30 a.m. and went into the basement to complete some chores. He stated that there are pipes hanging down from the ceiling, some of which are about 4 feet off the ground. When he closed the tavern, there was no damage to the ceiling in the basement, but when he returned he observed that the wooden frame of the door was damaged, the lock was hanging from the door and the ceiling was splintered and wood pieces were hanging down from it.

Rennie gave substantially the same testimony that he did at the hearing on the motion to suppress regarding the sequence of events which

occurred at the time defendant gave his statement. He did not recall which officers were present in the large area outside the interview room where defendant was being held, but believed that all the officers involved in the surveillance eventually did show up. He denied striking defendant at any time and did not see anyone else do so. Moran and Biebel entered similar denials and corroborated the events in the interview room as stated by Rennie.

The State then advised the jury of defendant's statement, and it was admitted into evidence. It indicated that defendant had attempted to gain entry into several taverns on the north side because he needed money, but was unsuccessful. He then went to the south side with his companions, where he used a tire iron to enter the tavern at 18th and Canalport. When he walked into the basement, he hit his eye on a wire and thought he knocked his eye out. At this point he left the building.

The same paramedic, who testified at the motion to suppress, testified for the defense at trial and gave a similar account of his examination of the defendant. He told the jury he had no independent recollection of this examination apart from his report which indicated that defendant had a black eye and bruises on his arm. He did not recall seeing any bruises on defendant's stomach or back and stated that the red mark on the photo of the defendant was in the area where he saw a bruise when he examined the defendant on the following day.

Defendant testified only to the events which took place at the station. The State attempted to cross-examine him on where he had been prior to being taken to the police station, but defense objections were sustained. He recounted being hit in the eye and that he received other blows but could not recall who struck him. He admitted signing a statement at the station and that he had been convicted of armed robbery in 1969 and bank theft and burglary in 1973.

On cross-examination, defendant was questioned about his prior testimony regarding where and how many times he was kicked. He stated that he was on the floor at least twice but did not know if he was kicked. He then stated that he did not recall if he was kicked in the back, but was kicked in the stomach. He also stated that Rennie was the only officer present when the statement was taken and that he answered his questions only when Rennie struck him in the stomach with the back of his hand. He also did not recall getting his picture taken or his previous testimony that he remembered that it was taken after the interview.

The court reporter who transcribed the testimony taken at defendant's motion to suppress was called in rebuttal. She stated that she accurately transcribed defendant's testimony on that date where he stated that he was kicked in the chest, stomach and back, and that he identified a photo as one taken of him after he signed the statement.

The jury found defendant guilty as charged. Defendant's motion for a new trial was denied, and the court sentenced him to an extended term of 14 years. Defendant now appeals, and, in addition to the brief which was filed by his counsel, defendant has sent additional material to this court which we shall consider as a supplemental *pro se* brief.

Defendant first contends that the court erred in denying his motion to suppress the confession given while he was in police custody. He asserts that the State failed to sustain its burden of proof in establishing that his injuries were not the result of police brutality and therefore did not demonstrate that the statement was voluntary. In support of his contention, defendant argues that the testimony of the paramedic who examined him at the jail and the picture taken at police headquarters corroborate his testimony, and that the officer, whom he accused of beating him, was never called to deny the beating.

■■■ It is well settled that a confession obtained by force or brutality is not voluntary and is therefore inadmissible. (*Brown v. Mississippi* (1936), 297 U.S. 278, 80 L. Ed. 682, 56 S. Ct. 461.) When there is evidence that a defendant received injuries while in police custody, the State must establish by clear and convincing proof that the injuries were not the result of police brutality. (*People v. Davis* (1966), 35 Ill. 2d 202, 220 N.E.2d 222; *People v. La Frana* (1954), 4 Ill. 2d 261, 122 N.E.2d 583.) The trial court must determine whether the confession was voluntary based on the totality of the circumstances and that determination will not be disturbed by a reviewing court unless it is contrary to the manifest weight of the evidence. *People v. Lewis* (1979), 75 Ill. App. 3d 259, 393 N.E.2d 1098.

In the instant case, the court denied defendant's motion to suppress and thereby implied that the State had met its burden of proof. (See *People v. Moats* (1980), 89 Ill. App. 3d 194, 411 N.E.2d 573.) After thoroughly reviewing the record, we find that this conclusion is supported by the evidence and not contrary to the manifest weight of the evidence.

Three police officers testified that they were present in the room when the statement was taken and that no one else was there. Two of these officers observed defendant's black eye at the scene of the arrest, and the third observed it when defendant entered the station. Each of the officers denied beating the defendant and further stated that no other officer did so in his presence.

In his confession defendant stated that he sustained the injury to his eye when he entered the basement and hit some object hanging from the ceiling. At trial there was evidence given by Nickeas and the owner of the building that there were rods and other things hanging down from the ceiling.

The defendant stated that he received the black eye from a punch

thrown by Nickeas and then described a brutal beating and kicking episode which he endured while his hands were handcuffed behind his back. The paramedic admitted that he had no independent recollection of the examination of the defendant and relied on his report, which showed only the bruises on the arm and a black eye. The report did not indicate that defendant had sustained any bruises or marks on his chest, stomach or back where defendant claimed to have been injured. In addition, the testimony regarding the picture of defendant revealed that defendant had a black eye and a small red mark on his arm when it was taken.

■■ While no explanation was given to account for the scratch or bruises on defendant's arm, this record does not indicate that the injury was of such magnitude to indicate that a suspect would be forced into signing a confession because of it. It is the function of the trial court to resolve conflicts in the evidence (*People v. Marek* (1980), 92 Ill. App. 3d 746, 415 N.E.2d 1230), and, after reviewing the entire record, we believe that the trial court could have properly and reasonably concluded that the statement was voluntary and not the result of physical coercion. *Cf. People v. Medina* (1978), 71 Ill. 2d 254, 375 N.E.2d 78.

■■■ Defendant further contends that the State did not meet its burden of proof in this matter because Officer Nickeas, whom defendant accused of hitting him, did not testify at the hearing on the motion. The State has the burden of proving that a confession was voluntary and has a duty to produce all persons whose testimony would be material on the issue of voluntariness or to explain their absence. (*People v. Lewis* (1979), 75 Ill. App. 3d 259, 393 N.E.2d 1098.) However, it is also well established that if the State fails to call a material witness the defendant must object in the trial court (Ill. Rev. Stat. 1979, ch. 38, par. 114—11(d)) or the matter is waived as a ground of contention on appeal. (*People v. Lewis* (1979), 75 Ill. App. 3d 259, 293 N.E.2d 1098; *People v. Lee* (1976), 41 Ill. App. 3d 502, 354 N.E.2d 543.) Since defendant in the instant case did not object in the trial court, we hold that he has waived this matter for purposes of appeal. See also *People v. Houston* (1976), 36 Ill. App. 3d 695, 344 N.E.2d 641.

Defendant also contends that he was denied his constitutional right to a speedy trial since 135 days passed between his arrest, continuous custody and trial. He claims that the first delay attributable to him occurred on August 30, 1980, when both parties agreed to a continuance.

The Speedy Trial Act provides that where a defendant is held in custody he must be tried within 120 days from the date he was taken into custody unless the delay is occasioned by the defendant. (Ill. Rev. Stat. 1979, ch. 38, par. 103—5(a).) In this regard defendant is bound by the acts of his counsel (*People v. Steele* (1970), 127 Ill. App. 2d 366, 262 N.E.2d 269), and any delays occasioned by defense counsel are attributed to the defendant (*People v. Brimmer* (1978), 60 Ill. App. 3d 214, 376 N.E.2d

337). A delay resulting from a continuance granted with the agreement of the defendant may also be charged to the defendant for purposes of the 120-day rule. *People v. Bracey* (1977), 52 Ill. App. 3d 266, 367 N.E.2d 351.

■■ In the instant case defendant was arrested on July 16, 1978, and remained in custody until his trial commenced on April 12, 1979. On August 4, 1978, the public defender appeared for the defendant, and the cause was continued to August 10, 1978, by order of court. The memorandum of orders does not contain an entry for August 10, 1978; however, the supplemental record filed in this court indicates that a hearing was held on that date. The transcript of that hearing reveals that defense counsel appeared for the defendant and requested a by-agreement date of August 30, 1978, which was granted by the court. Under these circumstances, the 20-day delay which followed is clearly chargeable to defendant in computing the 120-day limitation. As a result the record is clear that defendant was brought to trial within the proper time and was not deprived of his right to a speedy trial.

■■ In his *pro se* brief, defendant also contends that the extended term sentence imposed by the court was excessive. It is well settled that sentencing is a matter of judicial discretion, and absent an abuse of that discretion a sentence will not be altered upon review. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.) An extended term of imprisonment may be imposed by the trial court when a defendant is convicted of a felony, and he has previously been convicted of the same or greater felony within the last 10 years in Illinois. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(1).) Defendant was convicted of armed robbery in April 1969 and had an extensive criminal record. He was thus eligible for sentencing under this repeat offender statute, and we find no abuse of discretion in the sentence imposed by the trial court.

We also find no merit in defendant's further contentions that the court was predisposed to deny his motion to suppress before the hearing took place, and that the jury should have received an instruction on criminal damage to property or criminal trespass to land. Defendant further states that he has lost confidence in his attorney's ability to argue for him on appeal, but we do not find this tantamount to a claim of inadequate representation, nor does the record support such contention.

In sum, we find that the evidence demonstrates that defendant was proved guilty beyond a reasonable doubt and therefore affirm the judgment of the circuit court of Cook County.

Affirmed.

ROMITI, P. J., and JOHNSON, J., concur.