THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
FRANK WATTS, Defendant-Appellant.

Fifth District No. 5—87—0033

Opinion filed March 8, 1990.—Rehearing denied April 5, 1990.

900

Daniel D. Yuhas and Patricia G. Mysza, both of State Appellate Defender's Office, of Springfield, for appellant.

John Baricevic, State's Attorney, of Belleville (Kenneth R. Boyle, Stephen E. Norris, and Ellen Eder Irish, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:

Defendant, Frank Watts, appeals from a judgment of the circuit court of St. Clair County finding him guilty of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)), attempted murder (Ill. Rev. Stat. 1985, ch. 38, par. 8—4(a)), aggravated battery (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(a)), and armed violence (Ill. Rev. Stat. 1985, ch. 38, par. 33A—2). Defendant was sentenced to terms of imprisonment of 30 years for murder, 12 years for attempted murder, 12 years for armed violence, and five years for aggravated battery. The court ordered that the 30-year term run consecutive to the remaining concurrent terms.

On July 3, 1986, an indictment was filed charging defendant with

the murder of John Allen Cole, and two counts each of attempted murder, aggravated battery, and armed violence committed against Kelvin O. Smith and Christopher Cole. On November 17, 1986, the court severed the three counts of the indictment pertaining to Kelvin O. Smith because Smith had been seriously injured while on reserve duty in California and would not be available for trial. On February 26, 1987, the circuit court granted the State's motion to dismiss those charges. On September 16, 1986, a motion to suppress defendant's confession was filed by defendant.

At the suppression hearing the State called Detective Lenzie Stewart of the East St. Louis police department, who took defendant's statements. Stewart testified that while defendant's statement was being taken, other detectives were present in the area. Detective Henry was 30 to 40 feet north of defendant, Detective Walker was approximately 10 feet across from Stewart's desk, Detective Sergeant Cowan was seated at the entrance to the detectives' room, about 20 to 30 feet away from defendant, and Detective Ron Matthews was in the south office talking to defendant's girl friend. Stewart testified that none of these officers talked to defendant while he was being interrogated. Detective Henry testified that he did not talk to defendant. Detective Sergeant Cowan testified that he did not speak to defendant or to Detective Lenzie Stewart while Stewart was interrogating defendant. Detectives Walker and Matthews did not testify at the suppression hearing. At the close of the hearing, the court found that the statements were voluntary. The trial began on November 17, 1986, and concluded on November 24, 1986. The following facts were adduced at the jury trial.

John Allen Cole was killed on the evening of May 12, 1986, at the Gompers Homes, a housing project in East St. Louis. His brother, Christopher Cole, was injured by a .22 caliber bullet on the same evening. In the hours preceding the shootings, John Cole had been playing basketball with several youths at the Gompers Homes. Antonio Foster was involved in the basketball game with John Cole as a member of the opposing team. Foster called a foul against John Cole, and an argument ensued. After the argument ceased, John Cole went away from the basketball court toward the parking lot and across the lot to his girl friend's apartment, which was located in the 8 building.

Foster, still angry, then left the basketball area on foot with some friends, including Clover McKinney, Sean Clark, and Derrick Powell. This group, along with some other youths, ended up at defendant's house on Cleveland Avenue in East St. Louis. While much of the testimony of this group is similar, there are enough discrepancies to dis-

cuss each witness' testimony individually.

Antonio Foster testified that he had never met defendant before May 12, 1986. Initially, when Foster and the others arrived at the defendant's house, defendant was not home. After a few minutes, defendant drove up in a car. Defendant got out of the car and talked to Clover McKinney. Defendant then went into his house and came out with a black gun. Foster identified People's exhibit No. 5 as the gun that defendant retrieved out of the house. Foster then went back to the basketball court at the Gompers Homes and told those at the court to "get off the court. Because they are coming over to shoot up the m----- f----- playground." Foster stated that, approximately 30 seconds after he had warned the people on the basketball court, he saw defendant with Sean Clark and Clover McKinney. Defendant and Sean Clark were both armed. Foster said defendant was carrying a black rifle which he identified as People's exhibit No. 5, while Sean Clark was carrying a rifle which was identified as People's exhibit No. 6. Clover McKinney was unarmed. Defendant, Sean Clark, and Clover McKinney then walked toward the 8. building looking for John Cole. Foster then got in Charles Williams' car. Williams was one of the people Foster had warned to leave the basketball area. They headed for the 401 Liquor Store on Martin Luther King Avenue in East St. Louis, in an attempt to locate John Cole. When Foster arrived at the 401 Liquor Store, a man at the store told him that John Cole had just bought a beer and had left. Foster indicated that it is approximately a 45-second walk from the 401 Liquor Store to the Gompers Homes. About 30 seconds after Foster was told that John had left, he heard approximately four or five gunshots. Thirty minutes to an hour later, Foster went to the East St. Louis police station to make a statement in order to let the police know he was not involved in the shooting.

On cross-examination, Foster acknowledged that he gave a statement to the police that night, but he did not remember telling the police: "Frank Watts and Sean Clark was [sic] about 40 feet away from John Cole, Christopher Cole, and Kelvin Smith when he started shooting at them." Foster instead maintained that he did not see the shooting. Detective Sergeant Cowan testified that he took Foster's statement, which included the above-mentioned quote. Cowan stated that Foster also told him that he got into Charles Williams' car and drove off after the shooting started and that Watts and Clark were the only two people he saw with guns.

Clover McKinney testified that he was with Derrick Powell and Sean Clark at the parking lot close to the basketball court. Clover McKinney heard the fight between Antonio Foster and John Cole over a

foul. He estimated that the fight had lasted approximately three or four minutes when he stepped in and pulled Foster away. After the argument ended, Clover McKinney saw John Cole walk toward his girl friend's house. McKinney and Foster went around the administration building and found McKinney's girl friend to get money from her. McKinney saw that Foster was upset over the fight and was trying to calm him down.

Clover McKinney testified that he, his brother, Marlo McKinney, Derrick Powell, Antonio Foster, Stacy Evans, and Sean Clark all walked to defendant's house to get guns. According to Clover McKinney, at this point Sean Clark already had a .25 caliber pistol and he wanted to get some ammunition from defendant. Clover McKinney lived on the same street as defendant and had known defendant since he was a small child. Defendant was not home upon the group's arrival, but defendant soon drove up and stopped. Clover McKinney told defendant about the argument with John Cole. Defendant then went into his house and came out with a black, .22 caliber rifle, identified as People's exhibit No. 5 by Clover McKinney at trial. Clover McKinney, defendant, Sean Clark, and Derrick Powell then got in defendant's car and drove to the Phillips 66 station on 7th Street near the Gompers Homes. Clark and Powell walked away, and defendant and Clover McKinney went back to the basketball court where the fight occurred. McKinney testified that he was unarmed, but defendant had the black rifle. He stated they saw "a dude named Twist," who pointed them over to the next playground to find John Cole. When they got to the next playground, McKinney saw Christopher Cole, whom he had known for approximately two years. Defendant then told McKinney to leave. McKinney ran on the sidewalk in the Gompers Homes to State Street, and less than a minute after leaving defendant, McKinney heard gunshots. Approximately six minutes after hearing the shots, McKinney saw Sean Clark, Derrick Powell, Marlo McKinney, Stacy Evans, and an unidentified youth coming toward the Gompers Homes from State Street. Clark was armed with a .22 caliber rifle which Clover McKinney identified as People's exhibit No. 6. He knew the gun because his nickname "Stump" was carved in the stock of the gun. Later that evening, defendant came over to the McKinney residence and spoke with Marlo McKinney. Clover McKinney did not see John Cole with a gun.

Derrick Powell testified that he was with Sean Clark and Clover McKinney on the parking lot next to the basketball court. Powell did not hear an argument between Antonio Foster and John Cole, but he saw Cole run past him. Approximately three minutes later he went

over to the basketball court and heard Foster talking about the fight he had with John Cole. Then Sean Clark suggested they go to defendant's house, so Powell, Clark, Marlo McKinney, Clover McKinney, and Stacy Evans walked to defendant's house. Powell saw both Clover McKinney and defendant go into defendant's house. Defendant came out with a black rifle which Powell was able to identify as People's exhibit No. 5. Powell and Clark drove with defendant, but when the car stopped, both went to Powell's home in the 20 building of the Gompers Homes to get Clark's rifle which was at Powell's house. Both Powell and Clark then walked to the basketball court, but did not see John or Chris Cole. Clark then ran in a different direction, and Powell went to a friend's house in the 19 building of the Gompers Homes. Approximately five minutes later he heard gunshots. Powell saw neither Sean Clark nor defendant the rest of that evening.

Marlo McKinney (Clover's brother) testified that he arrived at the basketball court after the fight. He stated that he left the basketball court with the rest of the group previously identified. They first went to Derrick Powell's house. Powell and Sean Clark went into Powell's house while he and the others kept walking. Powell and Clark caught up with the group, and Marlo McKinney saw neither Powell nor Clark with any guns at this time. The group then walked to defendant's house. Upon defendant's arrival, Marlo McKinney saw his brother talk to defendant. Defendant went into his house alone, and upon his exit, Marlo thought defendant may have had a gun, but he could not be sure because it was dark. Marlo McKinney then left on foot while Clover McKinney, Sean Clark, and Derrick Powell left in defendant's car. Marlo was aware of a previous fight between his brother and the Coles.

Marlo walked with Stacy Evans to the gate to the Gompers Homes, where he saw Sean Clark and Derrick Powell. Clark had a brown rifle which he recognized because it had previously been at the McKinney home. Marlo could not say how much time passed, but sometime after seeing Clark and Powell, he heard six or seven shots. He then left the Gompers area and caught up with his brother at about State Street. Evans and Clark were also there. He does not remember whether or not Clark had the brown rifle at this time. He then went home, and soon after his brother arrived home. As he was going to sleep, defendant knocked on the door. Defendant told Marlo he had the guns and he was going to take them to his brother's house.

Bobbi McNamee, John Cole's girl friend, who lived at 8F Gompers Homes with Cole, testified that an upset John Cole came into the

house sometime after 9 p.m. and told her, "They are going to trip over a ball game." He went upstairs, and she tried to calm him down. She did not want him to leave the house because she thought there might be trouble. He left 8F Gompers with his gym bag. About 10 minutes after he left, Bobbi McNamee's door opened, John said, "Baby," and fell inside. Then Christopher Cole also fell inside the door, and he had John's gym bag. At this point, she heard shots fired at her residence. She then ran upstairs and called the police and an ambulance.

Alexander White testified that before the shooting, he was standing by John Cole's car and Myranetta Hines was sitting on the car. Their baby was also with them. The car was parked on a parking lot close to the playground and across the street from the 8 building. John Cole saw Myranetta Hines on the car and joked with her about sitting on his car. Cole then walked over and talked to Hines and White. He walked away from the car, heading toward the 8 building when shots were fired. White heard about four shots and then he heard John Cole say, "Oh," and hit the ground. Cole then got up and tried to run for his apartment. Because it was dark, White did not get a good look at the gunman, but he stated the intruder was a "short, black, skinny person." He took cover and about three or four minutes later heard a second round of shots fired from the other side of the 8 building. He also saw Christopher Cole run for the apartment where John had gone, and Christopher Cole fell on top of John. After the shots ceased, he saw a red Monte Carlo with approximately three people in it pull from around where the playgrounds were located and go through the parking lot at a high rate of speed. On cross-examination White denied telling patrolman John Thurman on the night of the shooting that a black male got out of the Monte Carlo with a rifle and began shooting.

Myranetta Hines testified that she saw John Cole walk from the car toward the 8 building. She heard one shot and saw John Cole fall to the ground and then drag himself to the apartment where he lived. She heard approximately two shots fired in quick succession to the first shot. The first set of shots came from the north end of the 8 building. Hines saw Christopher Cole running toward his brother, and then a second group of four or five shots came from the south end of the 8 building. She said that the person shooting was approximately five feet six inches tall and weighed 153 to 159 pounds. She saw the gunman with a rifle, but she could not identify either People's exhibit No. 5 or No. 6 as being the rifle she saw on May 12, 1986. She did not see John Cole or Christopher Cole with a gun. On cross-examina-

tion Hines acknowledged that she told Detective Sergeant John Smith that she saw a person dressed in black get out of a red Monte Carlo and begin shooting from the north end of the 8 building and then run to the south end of the 8 building and continue to shoot. She also agreed that she told Patrolman Thurman that she saw someone jump out of the Monte Carlo and shoot John Cole. In addition, she told the police that the person who did the shooting looked like a man named Leo Townsend.

Felicia Jackson, Myranetta Hines' niece, was also in the parking lot with Hines and Alexander White. When she heard the shots, she immediately ran toward the 8 building to her cousin's house.

Christopher Cole testified that he was a participant in the basketball game in which his brother John Cole and Antonio Foster got in a fight. He saw John Cole leave and Foster leave with a group of people including Clover McKinney, Stacy Evans, and Sean Clark. Christopher Cole next saw his brother when he was talking to Myranetta Hines on the parking lot by the 8 building. He saw John play with Hines' baby, walk to the 8 building, and then head toward the playground. John had his tote bag on his shoulder. At this point, Christopher Cole saw Clover McKinney and another young man with something in his hand. McKinney then walked away, and the other person approached John Cole. Christopher told his brother to look out and then this other person started shooting. Christopher said three shots were fired approximately three seconds apart. He saw John fall to the ground, drop the tote bag, and attempt to run toward the 8 building. Christopher Cole did not see where the gunman went, nor did he see a red and white Monte Carlo. Christopher then picked up the tote bag and headed toward 8F to help his brother. Christopher reached his brother approximately two to three minutes after the first set of shots were fired. Then he was shot. The next thing he could remember was being at the hospital. Christopher remained in the hospital for two weeks. In August 1986, a .22 caliber bullet was removed from Christopher Cole.

Patrolman John Thurman, East St. Louis police department, arrived at the scene at approximately 9:17 p.m. He found two black males lying on the floor. About 12 minutes later an ambulance arrived. Some other police officers arrived, and Thurman went to the hospital for approximately 20 minutes and checked on the victims. Thurman came back to the scene, which was not roped off, leaving several people with access to the area. Thurman checked the area and found five spent .22 shell casings, three on the northwest side of the 8 building and two on the southwest side of the 8 building. Dee Heil,

crime scene technician, arrived at the scene at 10:05 p.m., and Thurman pointed out the spent casings to him. Heil collected the casings, photographed the area, and collected blood samples. Due to the darkness, the search for evidence was done by flashlight. Thurman testified that he talked to Alexander White, Myranetta Hines, and Felicia Jackson concerning the shooting, and all three of them indicated that the person responsible for the shooting got out of a red and white Monte Carlo.

Captain Terry Delaney of the Illinois State Police apprehended defendant on May 14, 1986, at approximately 6 p.m. in front of defendant's residence. Defendant was placed under arrest and advised of his *Miranda* rights.

Detective Lenzie Stewart of the East St. Louis police department was assigned to the John Cole case. He testified that on May 15, 1986, he gave defendant his *Miranda* warnings at approximately 11:30 a.m. and defendant signed the *Miranda* form at approximately 11:40 a.m. At the time of the questioning, there were three other detectives in the central section of the detectives' offices. There was one detective in Stewart's lieutenant's office, and another detective in the south office.

Initially, defendant denied any involvement. Stewart then told defendant that defendant's girl friend, Kathy Kelley, was in the back of the station at that time giving a statement and that several of the other guys had already assisted the police and said defendant was responsible. After this, defendant orally admitted to Stewart that he had participated in the crime at the request of several youths and he had also hidden the weapons. Defendant then agreed to take Detective Stewart to where the weapons were hidden and directed Stewart to the residence of Linda Danser. After checking the basement, the guns could not be located. Detective Stewart questioned Danser. She said her children had found the guns, and her boyfriend, Ronell Jackson, took the weapons away. On the way back to the station, Detective Stewart stopped by Ronell Jackson's residence and left a message with his sister to have Jackson contact Stewart immediately. Once back at the station, Detective Stewart again read defendant his *Miranda* rights and had defendant sign a waiver form. Defendant then gave a six-page written statement concerning his involvement. Stewart testified that he typed out what defendant told him, and that the statement was not taken verbatim, but was as close as possible. This statement was then read to the jury. The following is a summary of the statement.

Defendant stated that on May 12, 1986, at approximately 9:30

p.m., he was driving a friend's car past his residence when he saw his girl friend, Kathy Kelley, and Clover (Stump) McKinney trying to flag him down. After he stopped the vehicle, Clover McKinney, Derrick (whose last name he did not know), Marlo McKinney, and Sean Clark ran up to the car. Clover then asked defendant to give him a gun which defendant had been keeping for Clover McKinney for about a week and a half. Defendant described the gun as a .22 caliber rifle, semiautomatic, black in color with black plastic handles and a long, black clip. Defendant asked Clover McKinney what was wrong, and Clover said that "he was tired of the old brothers in the Gompers Homes bothering him." Defendant then went into his house and got the rifle. Someone then asked defendant to take them back to the Gompers Homes so that they could get another rifle from Derrick's house. Defendant agreed to take them to Derrick's. Sean Clark, Clover McKinney, and Derrick Powell then got into the car, and defendant put the rifle on the front seat. Defendant drove to the service station on 6th and Martin Luther King Drive and parked the car. Derrick Powell and Sean Clark then walked to Derrick's house to get another rifle. Clover and defendant walked to the basketball court. Defendant had the rifle. Upon their arrival at the basketball court, there were only two or three guys there. At Clover McKinney's suggestion, they then went to check the other playground. On the way over, one of the guys on the basketball court told them that he (meaning John) had a gun. Clover McKinney saw a guy in the alley, told defendant, "There he goes," and then walked away. Defendant then met up with the person whom Clover McKinney had pointed out in the alley. This person was carrying a leather or suede pouch. Defendant said, "What's up?" Before this person could reply, defendant raised his rifle, which was at his right side hidden from view, and fired three shots at him. This man then ran off in a southwardly direction. Defendant ran southward around the building, and while he was doing this, he heard shots fired. Defendant reached the other side of the building, saw the man going into the back door of one of the apartments and fired several more shots at him. He said he did not know whether he hit the person at this point, but defendant knew he had struck him when defendant fired the first shot.

After defendant fired the second round of shots, he ran back to his car and drove to his house alone. He hid the rifle in the back of his house behind some old furniture. Approximately 10 minutes later, Sean Clark came to his house unarmed. They then drove to Lucy's house on North 28th Street. Defendant had been there earlier in the evening. Defendant stated he went back to Lucy's to establish an alibi

in case he was arrested for the shooting at the Gompers. Defendant and Sean Clark stayed at Lucy's until approximately 12:30 a.m. Defendant then took Clark and another passenger, Byron, to their respective homes. They did not discuss what had occurred.

When defendant arrived home for the second time, he took the rifle from behind his house to the home of Linda Danser, his brother's ex-girl friend, and hid it under her back steps. He had also stopped by the McKinney household, and Marlo McKinney had told him where the other rifle could be found. He also hid that one at Linda Danser's. He then went home and went to bed.

The next morning his brother, Jerome Watts, told him John Cole had been killed. That was the first time he realized that he knew the person he had shot. Defendant and John Cole grew up together but had not seen each other since second grade, and defendant did not recognize him on the evening of the shooting. Further, defendant stated that Sean Clark had not given him a .25 caliber automatic pistol the evening of May 12, 1986, nor had defendant been a passenger in either a red Monte Carlo or a light-colored Park Avenue on the evening of May 12, 1986.

Defendant signed the bottom of each page to indicate his agreement with what was written on the page. The only thing that Detective Stewart did not include in the statement was the fact that defendant was somewhat remorseful because he had grown up with the Cole family. After the formal statement was written, Stewart received a phone call from Ronell Jackson concerning the weapons. Detective Stewart met with Jackson, and they went to the Peacock Lounge on South 15th Street in East St. Louis. There, Stewart took possession of two rifles and a box of bullets. He took these back to the station and booked them into evidence.

David Peck, a forensic scientist specializing in latent fingerprints, checked the guns for prints, but none were found. James Hall, a forensic scientist specializing in firearms and tool mark examination, examined the guns and the spent casings found at the scene. He determined that all five cartridges were fired from the same weapon, marked "People's exhibit No. 5" at trial. People's exhibit No. 5 is a .22 caliber, semiautomatic rifle, black in color, manufactured by ARMI-JAGER. This gun expels spent cartridges automatically to the right. The magazine was missing from this gun when it was received by Hall for examination. Expert Hall estimated that six or seven cartridges would go into the magazine fitting this rifle. Hall was unable to determine which gun fired the spent projectiles recovered from John Cole and Christopher Cole because both were mutilated from

hitting their targets.

Dr. Harry Parks, pathologist, examined John Cole's body. He observed an entrance gunshot wound on the left chest, approximately between the fifth and sixth ribs. There was also a gunshot wound of the upper left abdomen on the left side just below the rib cage. There was an exit gunshot wound on the back at about the same level as the wound on the chest. There was also a split lower lip, which Dr. Parks took to be another gunshot wound because small fragments of metal were present in the chin and neck on an X ray. He concluded the gunshot wound to the chest was the cause of John Cole's death.

On Thursday, November 20, 1986, at approximately 11 a.m., defendant concluded his case, except for one witness, Glenda Chasten. She had not appeared even though she had been subpoenaed by defendant. A bench warrant was issued, and the trial court broke for a recess until 1:30 p.m. At 1:30 p.m., Chasten had still not arrived. The court adjourned until Friday, November 21, 1986, at 9 a.m. Chasten did not appear, and the defendant moved for a continuance. The State objected, and the prosecutor told the trial judge that he had spoken to Chasten's mother that morning and she had informed him, "that people had been hassling her about her daughter, that her daughter was out of town, that no one would find her and that she was not going to testify." When asked by the judge about the prospects of locating the witness in the next several days, the defendant's attorney replied that given that Chasten lived and worked in the area, and based on information that she had contacted an attorney, he felt there was "some likelihood that she would be found over the weekend." After some discussion, the court stated: "The obvious fact is this is not just an important witness for the defense. It appears to be an only witness for the defense. Deny this witness, it would appear the offense [sic] is nothing." The court then granted defendant's motion for a continuance until Monday, November 24, at 9 a.m., but Chasten did not appear at this time. The defense argued for a continuance until Wednesday, November 26, 1986. Defense counsel stated that he assumed that the witness had left town and that she would be returning, "although I have no—I have heard from no one that they know where she is." An offer of proof was made at that time as to what Chasten's testimony would be. Chasten gave a statement to the East St. Louis police department on May 13, 1986. Her statement indicated that around 9 p.m. on May 12, 1986, she was in front of her house at 21D Gompers sitting in her boy friend's van when a white Park Avenue pulled up. Soon after, Sean Clark approached the Park Avenue and the driver handed Sean Clark what appeared to be an M-

16. Chasten knew Sean Clark from previous meetings. She knew what an M-16 was because she was in the Reserves. Sean Clark then ran away from the Park Avenue. Chasten also saw another person approach the car, receive a gun and run behind the building where Sean Clark had gone in the Gompers complex. A red and white car then pulled up with some black males. She did not know anyone in the car. When this car pulled up, the white Park Avenue pulled away. Chasten then went into her house. About 15 minutes later she heard shots and looked outside. She then saw the same Park Avenue as previously described. It was parked at the south end of the 21 building, and she watched it pull away. After the offer of proof was given, the trial court denied defendant's motion for a continuance. Subsequently, defendant's motion for a mistrial was denied.

Defendant urges that the trial court erred in not suppressing his statement, stating as grounds that the statement was involuntary and that the People failed to produce all material witnesses at the suppression hearing. In his motion to suppress and at the hearing on that motion, defendant claimed his statement was involuntary and obtained in violation of his due process rights due to unfulfilled promises of leniency made by Detective Stewart and harassment by Detectives Matthews, Cowan and Walker and Lieutenant Henry. Both events allegedly occurred at Detective Stewart's desk.

Defendant testified that Matthews told him he did not like "young guys" in East St. Louis and would make sure that defendant received the electric chair or a life sentence. The other detectives suggested defendant be put back in his cell since they already had enough evidence on him without a statement. Stewart, who was present throughout, then told defendant he would take a different attitude and do what he could to help defendant, since John Cole, the victim, was the actual "bad guy," and would intercede with the State's Attorney to reduce his charge from murder in exchange for defendant's cooperation. Defendant claims his inculpatory statement was made as a result of Stewart's promises. Detective Stewart testified that he was the only one interrogating defendant, and that the other officers neither interrogated, listened to the interrogation, nor talked to defendant. He further testified that no threats or offers of leniency were made to defendant and that he did not indicate John Cole was the "bad guy." Detectives Cowan and Lieutenant Henry both testified that they did not speak with defendant. The People did not call Detectives Matthews and Walker. The trial court made the following ruling from the bench:

"Court finds that the statement of the defendant was not ren-

dered involuntary by any threats or coercions or inducements or promises that were sufficiently definite to be understood as in some manner enforceable. The Court finds, therefore, that the statements were voluntary. They should be submitted to the jury for whatever weight the jury deems appropriate."

■ Defendant argues that Stewart's statements constituted a promise of leniency sufficiently definite to render his statement involuntary. The trial court, however, chose not to believe defendant's position concerning threats and promises, and a trial judge is in the best position to weigh the credibility of the witnesses. (*People v. McGuire* (1968), 39 Ill. 2d 244, 234 N.E.2d 772, *cert. denied* (1968), 393 U.S. 884, 21 L. Ed. 2d 160, 89 S. Ct. 193.) After review of the record, we conclude that the circuit court's finding is not against the manifest weight of the evidence. *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.

Defendant further urges that defendant's statement should have been suppressed due to the People's failure to produce or explain the absence of two material witnesses at the hearing. (Ill. Rev. Stat. 1985, ch. 38, par. 114—11(d).) The People did not call Detectives Matthews or Walker to testify at the hearing on defendant's motion to suppress. Defendant made no objection to their absence at the hearing, during trial, or in his post-trial motion. Agreeing that objection was not made, defendant argues that the officers' absence and failure to explain their absence constituted plain error. (107 Ill. 2d R. 615(a).) The People contend Matthews and Walker were not material witnesses, and that this matter must be raised in the trial court or it is waived on appeal. Ill. Rev. Stat. 1985, ch. 38, par. 114—11(d); *People v. Clay* (1981), 98 Ill. App. 3d 534, 424 N.E.2d 814.

■ Both Detectives Matthews and Walker were material witnesses. Detective Matthews had interviewed defendant's girl friend, came by Stewart's desk to tell him about the statement she made, and was one of the detectives defendant claimed harassed him. Detective Walker's desk was approximately 10 feet from Stewart's desk, where defendant's interrogation took place, and was in the best position from which to observe and hear. Given their materiality, this court next considers the questions of waiver and plain error.

■ The pertinent paragraph of section 114—11 of the Code of Criminal Procedure of 1963 reads as follows:

"(d) The burden of going forward with the evidence and the burden of proving that a confession was voluntary shall be on the State. Objection to the failure of the State to call all mate-

rial witnesses on the issue of whether the confession was voluntary must be made in the trial court." (Ill. Rev. Stat. 1985, ch. 38, par. 114—11(d).)

By the language of the statute, defendant must object to the State's failure to call a material witness in the trial court to avoid waiver. (*People v. Lee* (1976), 41 Ill. App. 3d 502, 354 N.E.2d 543; *People v. Houston* (1976), 36 Ill. App. 3d 695, 344 N.E.2d 641, *cert. denied* (1977), 429 U.S. 1109, 51 L. Ed. 2d 562, 97 S. Ct. 1143.) As noted above, no objection was made in the trial court, so the objection was waived.

■■ We next consider the application of the doctrine of plain error. The criteria for application of plain error are whether the evidence is closely balanced or if the claimed error is of such a magnitude that defendant was denied a fair and impartial trial. (*People v. Gacy* (1984), 103 Ill. 2d 1, 468 N.E.2d 1171, *cert. denied* (1985), 470 U.S. 1037, 84 L. Ed. 2d 799, 105 S. Ct. 1410.) Although the courts of review are not inclined to find plain error in the waiver of this statute absent extraordinary circumstances (*People v. Houston* (1976), 36 Ill. App. 3d 695, 344 N.E.2d 641), when a review of all the circumstances suggests possible substantial constitutional infringement, the issue will be examined to determine if the plain error doctrine should be applied. (*People v. Willis* (1975), 26 Ill. App. 3d 518, 325 N.E.2d 715.) This examination must of necessity be on a case-by-case basis and the reviewing court's determination dependent on the circumstances of the particular set of facts before it.

The similarity of circumstances in *People v. Houston* (1976), 36 Ill. App. 3d 695, 344 N.E.2d 641, is helpful to our assessment and conclusion. In *Houston*, an armed robbery case, testimony was in conflict concerning police interrogation tactics used on defendant Bigson. He claimed that LaGrange officers threatened him with small clubs, that Chicago officers threatened him with nightsticks and actually hit him over the eye, that a LaGrange officer promised him leniency for a statement, that he was subjected to racial slurs, and that his statement was made due to fear of injury. The LaGrange officers testified as to their interrogation and denied any physical abuse. A photograph of the defendant showed no sign of wounds. The State did not call any of the Chicago officers, all of whom the defendant claimed were material witnesses. As in the instant case, no objection was made in the trial court. On review, the court determined that the defendant had waived this objection as it was not made in the trial court. The court further concluded that as the testimony of the police officers "squarely rebutted" that of the defendant and the trial court found

that no credible evidence had been introduced supporting the defendant's allegations, it would not ignore section 114—11(d) on the question of waiver.

In the instant case, after review of the suppression hearing and arguments of counsel, this court concludes that the evidence was not closely balanced and the effect of failure to call all material witnesses was not of such a magnitude that defendant was denied a fair and impartial trial.

The defendant next contends that the State failed to prove beyond a reasonable doubt that he committed attempted murder, armed violence, and aggravated battery by shooting Christopher Cole. The defendant argues that the evidence implicating him in the shooting of Christopher Cole was entirely circumstantial and such evidence is sufficient to support a conviction only if it is inconsistent with any reasonable hypothesis of innocence. Defendant maintains that the evidence suggests two such hypotheses: (1) Sean Clark, whom several witnesses placed on the basketball court with a .22 caliber rifle shortly before the shooting, may have shot Christopher Cole; or (2) the unidentified man that several witnesses saw get out of the Monte Carlo and begin shooting may have shot Christopher Cole.

Contrary to the defendant's assertion, the evidence in the instant case was not entirely circumstantial. Circumstantial evidence is the proof of facts or circumstances that gives rise to a reasonable inference of other facts that tend to establish the guilt of the accused. (*People v. Morris* (1986), 148 Ill. App. 3d 471, 475, 499 N.E.2d 495, 498.) Direct evidence is the proof of facts without the necessity of inference or presumption, or evidence of fact perceived by witnesses' senses. (*People v. Sherman* (1982), 110 Ill. App. 3d 854, 859, 441 N.E.2d 896, 900.) The defendant's statement that after shooting John Cole, he ran around to the south end of the 8 building and fired several shots at a figure entering one of the apartments was direct evidence implicating the defendant in the shooting of Christopher Cole. In addition there was direct evidence, in the form of testimony by several witnesses, that Christopher Cole was shot by someone firing from the south end of the 8 building as Cole was about to enter his brother's apartment. Even assuming, however, that the evidence was entirely circumstantial, we find that the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt of the shooting of Christopher Cole.

We note initially that the reasonable hypothesis of innocence standard of review in circumstantial evidence cases has been rejected by our supreme court. (*People v. Pintos* (1989), 133 Ill. 2d 286, 291,

549 N.E.2d 344; *People v. Eyler* (1989), 133 Ill. 2d 173, 191, 549 N.E.2d 268.) Instead, the test to be applied in reviewing the sufficiency of the evidence in all criminal cases, whether the evidence is direct or circumstantial, is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Pintos*, 133 Ill. 2d at 291; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) Under this standard of review, we find that there was sufficient evidence of defendant's guilt. Moreover, we find that the evidence was sufficient even when considered under the now discarded reasonable hypothesis of innocence standard.

■■ "Circumstantial evidence is generally sufficient to support a conviction if it is inconsistent with any reasonable hypothesis of innocence, but the trier of fact need not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." (*People v. Rhodes* (1981), 85 Ill. 2d 241, 249, 422 N.E.2d 605, 608.) The jury need not be satisfied beyond a reasonable doubt to each link in the chain of circumstances relied upon to establish guilt; it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the defendant's guilt. (*People v. Williams* (1977), 66 Ill. 2d 478, 485, 363 N.E.2d 801, 804; *People v. Franklin* (1985), 130 Ill. App. 3d 514, 519, 474 N.E.2d 776, 780.) A hypothesis of innocence based on the defense that another may have committed the crime may be rejected by the jury (*People v. Hendricks* (1986), 145 Ill. App. 3d 71, 102, 495 N.E.2d 85, 106), which is not required to disregard the inferences that flow normally from the evidence (*People v. Morris* (1986), 148 Ill. App. 3d 471, 475, 499 N.E.2d 495, 498). Proof of guilt beyond a reasonable doubt does not require proof beyond any possibility of doubt, and whether or not a reasonable hypothesis of innocence exists is a determination for the jury which will not be disturbed on review unless the proof is so unsatisfactory as to create a reasonable doubt of guilt. (*Franklin*, 130 Ill. App. 3d at 519, 474 N.E.2d at 780.) We find that the evidence as a whole is sufficient to support the jury's verdict.

The defendant next claims that he was denied a fair trial when the trial court abused its discretion in denying his motion for a continuance to allow further time to locate Glenda Chasten. The defendant contends that Chasten's testimony was material to his defense and could have affected the outcome of the trial. In support of his argument, the defendant notes the statement made by the trial judge to Glenda Chasten at her contempt hearing. Prior to sentencing Chasten

for her failure to appear and testify at the defendant's trial, the court stated: "A man stands to be imprisoned and his plight may be the result of your failure to appear." The State maintains that the court did not abuse its discretion because there was no reasonable expectation that the witness would be available in the foreseeable future. The State also argues that Chasten's testimony was merely cumulative and could not have affected the outcome of the case.

■ The grant or denial of a motion for continuance to procure the testimony of a witness is within the discretion of the trial court and its decision will not be disturbed absent a clear abuse of discretion. (*People v. Bryant* (1983), 115 Ill. App. 3d 215, 221, 450 N.E.2d 744, 748; *People v. Rivera* (1978), 64 Ill. App. 3d 49, 52, 380 N.E.2d 1018, 1020.) The denial of such a motion is not an abuse of discretion where there is no reasonable expectation that the witness will be available in the foreseeable future (*People v. Curtis* (1986), 141 Ill. App. 3d 827, 833, 491 N.E.2d 134, 139, *cert. denied* (1987), 480 U.S. 938, 94 L. Ed. 2d 774, 107 S. Ct. 1584; *People v. Roberts* (1985), 133 Ill. App. 3d 731, 735, 479 N.E.2d 386, 388), or where the missing witness' testimony is merely cumulative (*People v. Eure* (1986), 140 Ill. App. 3d 387, 399-400, 488 N.E.2d 1267, 1275) or confined to collateral matters which would not have affected the outcome of the trial (*Bryant*, 115 Ill. App. 3d at 221, 450 N.E.2d at 748; *Rivera*, 64 Ill. App. 3d at 53, 380 N.E.2d at 1021).

■■ In the instant case, we find no abuse of discretion by the trial court in denying the defendant's motion for a continuance. The defendant was given from late Thursday morning until the following Monday to locate the witness. There were clear indications that Chasten was unwilling to testify and had purposely absented herself from the jurisdiction. Under such circumstances, it was clearly within the trial court's discretion to refuse to delay the proceedings any longer.

■ The defendant next contends, and the State concedes, that his convictions for armed violence and aggravated battery must be vacated because they were based on the same physical act that resulted in his conviction for attempted murder. The defendant was found guilty of the attempted murder of Christopher Cole by shooting him in the chest, aggravated battery by intentionally causing great bodily harm to Cole by shooting him in the chest, and armed violence predicated on the aggravated battery. Christopher Cole was shot once; consequently, we vacate the defendant's convictions for armed violence and aggravated battery because more than one offense was carved from the same physical act. See *People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E.2d 477; *People v. Nolden* (1980), 91 Ill. App. 3d 532, 414

N.E.2d 1124; *People v. Sass* (1979), 73 Ill. App. 3d 554, 392 N.E.2d 399.

The defendant was sentenced to 30 years' imprisonment for the murder of John Cole and to terms of imprisonment of 12 years for attempted murder, 12 years for armed violence, and five years for aggravated battery. The latter three sentences were imposed concurrent to one another and consecutive to the 30-year sentence for murder. The defendant argues that we should remand this cause for a new sentencing hearing because the court may have been influenced by the vacated convictions. In addition, the defendant contends that he is entitled to resentencing on his murder conviction because the court considered an improper aggravating factor—that his conduct caused great bodily harm—that is implicit in that offense. *People v. Martin* (1988), 119 Ill. 2d 453, 519 N.E.2d 884; *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138.

■■ While we believe that the trial court could properly consider great bodily harm as an aggravating factor in sentencing the defendant for attempted murder (see *People v. Brisker* (1988), 169 Ill. App. 3d 1007, 1013-14, 523 N.E.2d 1191, 1195), its use as an aggravating factor in sentencing the defendant for murder was improper, since great bodily harm is inherent in the offense (see *Martin*, 119 Ill. 2d 453, 519 N.E.2d 884; *Saldivar*, 113 Ill. 2d 256, 497 N.E.2d 1138). The sentencing court may, of course, consider the force employed and the manner in which the victim's death is brought about. (*Saldivar*, 113 Ill. 2d at 271, 497 N.E.2d at 1144.) It appears from the record, however, that the court may have considered the end result of the defendant's conduct, a result which is implicit in every murder. While consideration of an improper aggravating factor in sentencing does not always require remandment, resentencing is required where the reviewing court is unable to determine the weight given to the improper factor. (*People v. Bourke* (1983), 96 Ill. 2d 327, 332, 449 N.E.2d 1338, 1340.) The uncertainty in this case is compounded by the possibility that the vacated convictions for armed violence and aggravated battery may have influenced the sentencing court. We find, therefore, that remandment is necessary. Accordingly, we vacate the defendant's sentences for murder and attempted murder and remand for resentencing. While we remand for resentencing on defendant's convictions for murder and attempted murder, we recognize that the trial court may reimpose the same sentences; nevertheless, any sentence must be consistent with the principles set forth in *Martin* and *Saldivar*. (See *People v. Smith* (1990), 195 Ill. App. 3d 878.) In view of our decision, we need not address the defendant's further conten-

tions of error regarding his sentencing hearing.

Finally, the defendant maintains that he is entitled to 238 days' credit against his sentence for time he spent in custody while awaiting trial. It appears from the record the defendant was arrested on May 14, 1986, and was sentenced on January 6, 1987. Accordingly, the defendant is entitled to 238 days' credit against any sentence that the trial court may impose on remand. See *People v. Johns* (1984), 130 Ill. App. 3d 548, 474 N.E.2d 739.

For the above-stated reasons we vacate the defendant's convictions and sentences for armed violence and aggravated battery. We affirm the defendant's convictions for murder and attempted murder, vacate his sentences for those offenses, and remand to the circuit court for resentencing.

Affirmed in part; vacated in part and remanded.

RARICK and HOWERTON,* JJ., concur.

---

*Justice Howerton participated in the decision of this case after the recusal of Justice Goldenhersh, who had heard oral argument.