THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAMON RALON, Defendant-Appellant.
First District (5th Division) No. 1—87—1036

Opinion filed March 28, 1991.

Randolph N. Stone, Public Defender, of Chicago (Mark H. Kusatzky, Assistant Public Defender, of counsel), for appellant.

John J. O'Malley, State's Attorney, of Chicago (Inge Fryklund, Jane E. Loeb, and David Gaughan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COCCIA delivered the opinion of the court:

Defendant Ramon Ralon was charged with two counts of armed robbery and two counts (later nol-prossed) of armed violence arising out of an incident which occurred in the early morning of March 9, 1986, at a tavern located at 2246 South Kedzie, in Chicago. Luis Reyes, the bartender, testified that at about 1 a.m. he and two waitresses named Mary Lou Castro and Rosa Rodriguez were working when two armed men entered the bar. One had a shotgun and the other a pistol. The man with the shotgun opened the door and fired into the ceiling. Reyes could see the men were wearing black Ninja outfits which prevented him from seeing their faces. The robbers, speaking in Spanish, made everyone in the tavern get up by the bar. The man with the shotgun went behind the bar, asked Reyes for money, and placed the shotgun barrel against his head. The man with the pistol stayed by the front door. Reyes opened the cash register, and the man took the money, about $500, and left, firing the shotgun again into the ceiling. Reyes described the man with the shotgun as "more or less" his height, which was 5 feet 6 inches tall. The man with the pistol was shorter than the man with the shotgun. Reyes identified the shotgun, People's exhibit No. 1, as the shotgun used by the robbers. He identified People's exhibit No. 2, a Ninja suit, as looking like the Ninja suit worn by the robbers. Reyes could not identify defendant Ralon as one of the robbers.

Mary Lou Castro did not testify and was believed to be in Houston, Texas. Rosa Rodriguez testified to a sequence of events similar to Reyes' testimony. She described the men as both speaking Spanish and wearing black clothes. She identified the shotgun and the Ninja clothes. Rodriguez also did not identify defendant as one of the robbers; she said that all she could see was around the man's eyes.

Assistant State's Attorney Michael Gerber testified that on March 11, 1986, he took defendant's confession to the armed robbery. Gerber stated that he conversed in English with defendant and that defendant waived his *Miranda* rights. Gerber wrote down what defendant told him and defendant signed the written confession. Gerber also showed defendant a shotgun, which defendant identified as the gun used in the robbery.

In his confession defendant stated that on March 8, 1986, Pedro Lopez came to his house carrying a shotgun. They discussed robbing a tavern on Kedzie Avenue. Defendant and Lopez walked to and entered the tavern. According to defendant, Pedro fired three shots into the ceiling. Pedro then told everyone to put their wallets on the bar and

the woman behind the bar to take the money out of the cash register. While Pedro held the shotgun, defendant went to the cash register and took 11 $1 bills that were placed on the bar by the woman. Defendant and Pedro then left and went into the alley and split the money. Defendant stated that he had been treated fairly by the police and that no force or threats had been used against him.

Marcos Arc testified that he knew Pedro Lopez as "Chocolate" and that on March 8, 1986, Lopez came to his house on Troy and 23rd Street and borrowed a shotgun. Arc had bought the shotgun on the street about a week previously. The next day, Monday, March 9, Arc went to Lopez's house to get the shotgun back. He took it home and put it under the bed, where it stayed until the police came to get it. Arc gave the police the shotgun. Arc then went with the police to look for defendant Ralon and was present when defendant was arrested. Arc accompanied defendant and the police to the station.

Officer Lonnie Segroves testified that he and fellow officers arrested Pedro Lopez. He also testified to obtaining a .12 gauge shotgun from Marcos Arc. Segroves and two other officers then arrested defendant, and defendant made a statement to him. Segroves testified that he gave defendant *Miranda* warnings and defendant waived his rights. According to Segroves, defendant told him that he and "Chocolate" had robbed the tavern, and then he said "Pedro." Defendant also told Segroves that he had a black Ninja outfit at home, and later signed a consent form allowing a search for the outfit. Segroves, accompanied by Officers Parra and Pena, went to defendant's house and retrieved the Ninja suit. The parties stipulated that another police officer reported to the tavern at about 1 a.m. on March 9 and recovered two spent .12 gauge shotgun casings.

Defendant Ralon testified that he was 19 years of age and that he never learned to read or write. Defendant denied robbing the tavern. He described his arrest and being taken to the police station, where he saw "Chocolate" and Marcos Arc. Defendant denied that he had been read his rights. He described being in a room with four police officers, none of whom were female, and described being intimidated and struck with a telephone book by one of the officers, who he said was Spanish with black hair and a black mustache. Defendant admitted having previously described the officer as being white with dark blond hair. Thereafter, defendant described signing two writings which he did not read, one to get the Ninja suit. Defendant testified that he signed another paper without knowing what it said because he was afraid of the police. Defendant denied that he had been given his *Miranda* rights by State's Attorney Gerber. Defendant acknowledged

that he had known "Chocolate" (Pedro Lopez) for about a half year. Defendant stated that he did not know if he had voluntarily signed a statement. Defendant ultimately denied telling Officer Segroves, Detective Leuser, or Assistant State's Attorney Gerber that he had robbed the tavern.

After the trial court denied a motion for directed verdict on the armed robbery counts, Officer Maureen Doyle testified in rebuttal that she had been present at the police station with defendant the entire time following his arrival while under arrest on March 11. Doyle denied seeing any coercion or hitting involving defendant. She was present until the State's Attorney arrived that evening to interview defendant. The evidence then closed and an instruction conference was held, followed by arguments of counsel and jury instructions.

Defendant first challenges the trial court's ruling at a fitness restoration hearing, held October 16, 1986, that defendant was fit to stand trial even though he had stopped taking his medication and despite having been reported "fit with medication." Defendant believes that the court should have had a *bona fide* doubt as to fitness and referred defendant for additional treatment.

On April 22, 1986, defendant was examined and found not fit (not mentally competent) to stand trial by Dr. Kaplan. However, the recommendation was that defendant would be fit within one year. On June 13, 1986, the court found defendant not fit to stand trial. Defendant was placed in the custody of the Illinois Department of Mental Health and Developmental Disabilities which, on July 2, 1986, reported to the court that defendant could be restored to fitness and included a treatment plan, as required by Illinois law. (See Ill. Rev. Stat. 1985, ch. 38, par. 104—17.) On September 23, 1986, the Department of Mental Health and Developmental Disabilities filed a progress report, as required by law (Ill. Rev. Stat. 1985, ch. 38, par. 104—18). The report concluded that defendant "had been restored to fitness and is able to understand the nature of the charges against him and cooperate in his defense." However, the report also listed four medications defendant had been taking.

On October 7, 1986, a report from the Cook County Psychiatric Institute was prepared, recommending that defendant be found fit to stand trial. On October 16, 1986, a restoration hearing was held before Michael P. Toomin, Cook County circuit court judge. Dr. Matthew Marcus testified, as did defendant.

Dr. Marcus testified that he evaluated defendant and examined several prior reports on defendant prepared earlier at the Elgin Mental Health Center or the Psychiatric Institute. Dr. Marcus was of the

opinion that defendant was fit to stand trial "with medication." He described four types of medication that defendant was taking. He described defendant as being consistently aware of the charges against him. Defendant was capable of assisting in his defense by cooperating with his attorney. Defendant was aware of the roles of the various court personnel and their function. Dr. Marcus described the side effects from the psychotropic medication defendant was taking as drooling of saliva, muscular rigidity, and a slowing down of body functions. Higher doses, near the toxic range (which defendant was not receiving), could cause involuntary shakes and movements or blurred vision. Headaches were not a prominent symptom of the psychotropic medication being taken by defendant, although headaches could result from any medication, including nonpsychotropic varieties. Dr. Marcus agreed that it was possible that defendant's antidepressant drugs could cause headaches.

Dr. Marcus testified that defendant suffered from a serious mental illness, specifically, schizoaffective disorder. He was aware that defendant had been hospitalized for about three months in 1984 at the Psychiatric Institute and had been released with medication. He was unaware of a six-month course of psychiatric treatment and hospitalization when defendant was 16 years old. Dr. Marcus testified that to remain stable it was necessary for defendant to continue taking his antidepressant medication. Dr. Marcus testified that a person who stopped taking medication might decompensate but that it was difficult to predict when and if that decompensation would occur. Decompensation depended on various factors such as the seriousness of the mental illness and the chronicity, and individual factors. As a rough approximation, Dr. Marcus felt that defendant could begin to show decompensation after four to six weeks. Later, Dr. Marcus testified that it was a possibility that defendant could decompensate in that period of time. However, Dr. Marcus also testified that some persons might stop medication and continue for months without decompensating. Other, more "brittle" persons might decompensate in a few days. There were other drugs available which would have a stabilizing effect on defendant.

Defendant testified that he had stopped taking his medication for the past seven days as it made him feel ill. He described the side effects as a numb mouth and a feeling of lightness. Defendant had taken other medication while at the Elgin Psychiatric Institute and only one of those medications caused him to feel adverse side effects. On cross-examination defendant testified that he knew who his lawyer was and that he knew the charge was armed robbery.

Defense counsel argued that because Dr. Marcus had determined defendant "fit with medication" and defendant had testified that he had not been taking medication for seven days, there was reason to doubt defendant's fitness to stand trial. Defense counsel argued that, "regardless of whether the defendant appears fit today," the court "should seriously consider the defendant may not be fit in the next couple of weeks." Because defendant could become unstable at any time in the next four to six weeks, defense counsel argued that the court should send defendant back to the Psychiatric Institute for further analysis "as to whether there are other psychotropic drugs that could be used to stabilize his condition." The State's Attorney argued that the side effects were irrelevant and that if a person who stopped taking medication was automatically unfit for trial, a person could refuse medication in order to indefinitely postpone trial.

Based on the evidence before it, the trial court found defendant fit to stand trial with medication. The court found no indication that defendant did not remain fit even if he was not taking his medication. The court declined to conjecture on the possibility of decompensation. However, the court stated that "efforts should be made to find appropriate drugs that would not have the effects on him."

I

■ It is familiar law that convicting a person who is unfit to stand trial violates due process. (*People v. Murphy* (1978), 72 Ill. 2d 421, 430, 381 N.E.2d 677; *Pate v. Robinson* (1966), 383 U.S. 375, 378, 15 L. Ed. 2d 815, 818, 86 S. Ct. 836, 838.) A State must provide adequate procedures to protect a defendant's right not to be tried while unfit. *People v. Murphy*, 72 Ill. 2d at 430, 381 N.E.2d at 682; *Drope v. Missouri* (1975), 420 U.S. 162, 172, 43 L. Ed. 2d 103, 113, 95 S. Ct. 896, 904.

■■ Illinois provides statutory procedures controlling the inquiry and disposition of questions of fitness to stand trial. (See section 104—10 *et seq.*, of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 104—10 *et seq.*).) Under section 104—10, a defendant is presumed to be fit to stand trial; a defendant is unfit when he or she is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. The critical inquiry is whether the facts present a *bona fide* doubt that defendant possessed the two qualities necessary to make him fit for trial. (*People v. Murphy*, 72 Ill. 2d at 431, 381 N.E.2d at 682.) When *bona fide* doubt is raised as to a defendant's fitness to stand trial, the court must order a hearing held. (Ill. Rev. Stat. 1989, ch. 38, par. 104—11(a).) At the hearing, the burden of proving the defendant fit to stand trial by a preponderance of

the evidence is on the State; the State bears the burden of going forward with the evidence. (Ill. Rev. Stat. 1989, ch. 38, par. 104—11(c).) Whether a *bona fide* doubt has been raised is a decision resting largely within the discretion of the trial court. *People v. Murphy*, 72 Ill. 2d at 431, 381 N.E.2d at 682.

■■ ■ Illinois courts have generally found that no single factor in itself raises a *bona fide* doubt of a defendant's fitness to stand trial. (*People v. Lucas* (1986), 140 Ill. App. 3d 1, 7, 487 N.E.2d 1212, 1217.) The use of prescribed medication to render a defendant fit to stand trial has been approved; the reliance on such medication does not raise a *bona fide* doubt of lack of fitness. (*People v. Dalfonso* (1974), 24 Ill. App. 3d 748, 751, 321 N.E.2d 379, 382; *People v. Dominique* (1980), 86 Ill. App. 3d 794, 804, 408 N.E.2d 280, 289; *People v. Tilson* (1982), 108 Ill. App. 3d 973, 976, 439 N.E.2d 1298, 1300.) A defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication. (Ill. Rev. Stat. 1989, ch. 38, par. 104—21(a).) Through section 104—21(a), the legislature intended that where a trial court has advanced notice of such medication, a hearing is mandatory to determine fitness before the case proceeds. *People v. Tilson*, 108 Ill. App. 3d at 978, 439 N.E.2d at 1301.

■■■ When a defendant has been determined unfit to stand trial, and there is a substantial probability of fitness within one year if treatment is provided, the court must order treatment. (Ill. Rev. Stat. 1989, ch. 38, par. 104—16(d).) When a defendant is found unfit to stand trial and treatment has been ordered, the court must provide a 90-day hearing to reexamine the issue of defendant's fitness to stand trial. (Ill. Rev. Stat. 1989, ch. 38, par. 104—20(a).) If the court finds the defendant to be fit to stand trial, it shall set the matter for trial. However, the court may order continued treatment if the defendant is in need of continued care or treatment and the supervisor of the defendant's treatment agrees to continue to provide it. (Ill. Rev. Stat. 1989, ch. 38, par. 104—20(b).) In addition, if a defendant who is receiving psychotropic medication is found to be fit without the use of medication if he undergoes treatment, the court may order the defendant to undergo or to continue treatment within the time limits prescribed in the article. Ill. Rev. Stat. 1989, ch. 38, par. 104—21(a).

Defendant argues on appeal that the trial judge should have had a *bona fide* doubt as to his fitness to stand trial with medication when, at the restoration hearing, defendant stated that he had not been taking medication for the past seven days. Defendant contends that the trial

court had a *sua sponte* duty to order a new fitness examination and a new hearing.

Although defendant's analysis is cast in the constitutional language of the *bona fide* doubt standard, this court is unpersuaded that it is useful to apply that standard to the facts in the case at bar. The constitutional standard at once permits the State to presume a defendant mentally or physically fit for trial, while at the same time providing a sensitive threshold which, when crossed, requires the court to stop further proceedings until adequate inquiry as to fitness can be carried out. Once that process of inquiry is begun, it makes little sense to continue to apply a sensitive triggering mechanism like the *bona fide* doubt standard to guide further review of the developing facts produced by the inquiry. The whole point of the inquiry is either to remove doubts about unfitness and proceed to trial (or plea and sentencing), or to reliably determine unfitness and thus interrupt progress to trial. The constitutional value at stake is to avoid trying the unfit and to provide adequate procedures to reliably separate the fit from the unfit. We agree with the People that if the inquiry remains at the level of a *bona fide* doubt without concrete resolution based on developed evidence, there could result a perpetual motion between the stage of doubt and the stage of referral for further examination.

█ At the same time, when a defendant is deemed mentally fit only based on his taking psychoactive medications, the fact that he has not received, or has ceased taking, such medication is an important fact demanding further scrutiny by the court and it may constitute a *bona fide* doubt of fitness. (See *People v. Jackson* (1978), 57 Ill. App. 3d 809, 813-14, 373 N.E.2d 583, 587 (defendant found fit for trial if medicated, but failure to receive medication five days before trial not sufficient to raise *bona fide* doubt where court ordered defendant hospitalized nightly with medication provided as soon as problem discovered; lack of medication before sentencing when specifically ordered by court did raise *bona fide* doubt where medication was *sine qua non* of fitness to cooperate with counsel).) In cases typified by *People v. Jackson*, the defendant has been determined unfit and then, with the addition of treatment and maintenance on medication, is found fit. It makes sense to apply the *bona fide* doubt standard on the facts of *People v. Jackson* because the defendant has been restored to fitness and the case is progressing.

A much different situation arises when the defendant has been found not fit for trial and then, after treatment, is reported fit and a restoration hearing is held. At that point the inquiry by the court is to determine the ultimate question of fitness or unfitness based on evi-

dence that includes professional evaluation by medical experts. As previously noted, the Illinois statutory scheme provides for treatment plans, progress reports, and 90-day restoration hearings. All of these provisions assume that a *bona fide* doubt of fitness already exists and that the People will assume the ultimate burden of proving fitness. See *People v. Lucas* (1986), 140 Ill. App. 3d 1, 6-7, 487 N.E.2d 1212; *People v. McCullum* (1977), 66 Ill. 2d 306, 314, 362 N.E.2d 307.

■■■ In this context we find the critical inquiry to be whether the People have carried the burden of production and persuasion, by the preponderance of the evidence standard. (Ill. Rev. Stat. 1985, ch. 38, par. 104—11(c).) The People argue that at a restoration hearing the preponderance standard should apply. (See State's reply brief, at 20-21.) This court has reviewed the relevant provisions of Article 104, "FITNESS FOR TRIAL, TO PLEAD, OR TO BE SENTENCED," Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, pars. 104—11(c), 104—13, 104—20), and having done so, it is satisfied that the legislature intended the preponderance standard to govern the burden of persuasion at the original fitness hearings and at restoration hearings, alike.

Therefore, we characterize defendant's argument not in constitutional terms but in the terms of the controlling statutes. The question is whether, given a recommendation that a defendant will be "fit for trial with medication," the State has proven the defendant fit notwithstanding that the defendant has stopped taking the prescribed medication or a comparable substitute. The question can only be determined by reviewing the evidence.

■■■ We find the trial judge's ruling is supported by a preponderance of the evidence. First, there was no other medical testimony than that of Dr. Marcus. There was not, for example, conflicting testimony as to defendant's likely rate of decompensation without medication. There is no indication that the side effects defendant claimed to experience were related to the symptomology of his illness. Second, defendant testified at the hearing. The trial judge viewed defendant's demeanor. The record before us demonstrates no lack of lucidity. The trial judge apparently observed no difficulties; defendant appeared capable. Third, although there was a risk that defendant might decompensate, the testimony by Dr. Marcus was that he might not decompensate. Fourth, we note that defendant testified at a hearing to suppress his confession about a month later, and also testified at trial. On both occasions he was observed by the trial court. In our record, on both occasions he appears lucid. Before sentencing he was again referred for a fitness evaluation and was declared fit. On this occasion

the referral was not with regard to his medication. Additionally, the court also observed defendant at the sentencing hearing, where defendant addressed the court. Finally, the court stated at the restoration hearing that the situation should be watched and that alternative medications (which did not produce side effects) should be found.

On the basis of the evidence, we hold that the People sustained their burden of proof and the trial court did not err in finding defendant fit for trial despite defendant's election to stop taking his medication.

## II

In defendant's second issue he contends the trial court erred by denying his motion to suppress his confession when the State "failed to produce, on the initial hearing date, all material witnesses to the charge of a coerced confession, thus not meeting its burden of proving the confession voluntary." (Defendant's brief on appeal, at 24.) The gist of defendant's claim is that the arresting officers were not produced at the initial suppression hearing, as required by section 114—11(d) of the Illinois Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1985, ch. 38, par. 114—11(d).) Defendant challenges the trial court's denial of his motion to suppress at this stage of the proceedings. This issue is preserved for appeal by defendant's objection at the hearing and by his motion for new trial. See *People v. Terrell* (1989), 132 Ill. 2d 178, 201-02, 547 N.E.2d 145, 152-53.

After the trial court denied defendant's motion to suppress, it adjourned the suppression hearing to allow the People to produce additional witnesses, namely, the arresting officers. Two officers were produced but not Officers Doyle and Pena. In order to fully review defendant's claim, we will consider the State's nonproduction of Officers Doyle and Pena. Ultimately, Doyle testified at trial. Pena never testified at the suppression hearing or the trial, although he was one of the arresting officers. We review this issue in the interest of justice and under a plain error analysis. *People v. Terrell*, 132 Ill. 2d at 201-02, 547 N.E.2d at 152-53; *People v. Watts* (1990), 195 Ill. App. 3d 899, 913, 552 N.E.2d 1048, 1057-58.

This court must determine whether the trial court's initial ruling was correct. In addition, we will consider whether the failure of the People to produce, or explain the absence of, Officers Doyle or Pena at the suppression hearing constitutes a violation of the statutory requirement that the State produce all material witnesses on the issue of whether the defendant's confession was voluntary.

 We hold that the trial court did not err reversibly in its initial ruling denying defendant's motion to suppress for lack of production of all material witnesses where the trial court adjourned the hearing and two of the arresting officers ultimately testified. Further, we hold that the failure to produce Officer Doyle was harmless in light of her trial testimony. Finally, we hold that the failure to produce or explain the absence of Officer Pena was, on the present record, not plain error.

The following factual background underlies our holding. Defendant was arrested at about 4 p.m. on March 11, 1986, by three Chicago police officers. Defendant made a formal, written confession to Assistant State's Attorney Gerber at about 8 or 8:30 p.m., on that date. Previously, defendant orally confessed in an interview with Detective Leuser, which started at about 5 or 5:30 p.m. It is defendant's contention that prior to his interview with Leuser, one of the arresting officers coerced him by hitting him on the head with a telephone book at the station house. As a result, he made his subsequent confessions.

None of the arresting officers were produced at the November 17, 1986, suppression hearing. The State initially produced Leuser, who testified that there was no coercion used during his interview with defendant. However, Leuser admitted that he was not an arresting officer and had no knowledge of what transpired prior to his interview. Defendant then moved to strike Leuser's testimony and to suppress the confession because the arresting officers had not been called. The trial court denied the motion because the written motion to suppress did not make specific factual allegations and because the court had heard no evidence of coercion. The court then added that the material witness rule was not "iron clad." The trial court opined that once a *prima facie* case was made by the State, the court could rule on the admissibility of the confession and, if additional witnesses were produced at trial, the reviewing court could determine that the trial court's ruling was correct. This initial ruling is challenged on appeal.

Defendant then testified that he had been arrested by three officers. According to defendant, he was taken to the station house where a 6-foot-tall, dark blond, white male plainclothes officer had hit him, as described above. Also, defendant denied that he had received *Miranda* warnings at the arrest scene or the station house. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) Defendant acknowledged his signature on the two-page written statement but denied an ability to read the warnings of rights in the statement. Defendant also denied that Leuser had read the *Miranda* warnings to him.

Defendant testified that he was hit about 20 minutes before Leuser talked to him. As stated, the arrest had occurred at about 4 p.m. Defendant admitted he did not tell Leuser or Gerber about being hit, but he said that he did not do so because he was afraid. At one point defendant testified that three or four officers were present when he signed the written statement and that one of the arresting officers held a shotgun and sat to his left and the other arresting officer, the one who hit him, was also there. Also present was defendant himself, as was the person who took the statement, whom defendant identified as Detective Leuser, not Assistant State's Attorney Gerber. Defendant testified that he had a lump under his hair on his left temple and that his head hurt for two or three hours after being hit.

At the conclusion of the initial hearing, the State indicated that an adjournment would be appropriate to locate the arresting officers. The hearing was adjourned until November 24 and, ultimately, concluded on December 2, 1986. On November 24, Officers Parra and Segrove testified for the People. Defendant testified on his own behalf. On December 2, 1986, Assistant State's Attorney Gerber testified.

According to the hearing testimony of Officer Parra, defendant was arrested by four officers: himself and Officers Segroves, Doyle, and Pena. However, Officer Doyle testified at trial that she did not participate in defendant's arrest. Officer Doyle testified that she had participated in the earlier arrest of the codefendant, Lopez, and had remained at the station house thereafter. When defendant was arrested, he was placed in custody and she was present with him for the next several hours. Officer Doyle denied seeing or committing any coercive acts regarding defendant.

Officer Parra testified that none of the arresting officers were blonde but described Officer Segroves as a white male, approximately age 40, grey hair, mustache, and about 5 feet 10 inches tall, and about 180 pounds. Officer Parra was self-described as an Hispanic male with black hair and 5 feet 11 inches tall. Officer Segroves testified at the suppression hearing that Officer Pena was a Latin male with black hair, who was about 5 feet 7 inches tall. According to Officer Parra, he last saw defendant at about 4:45 or 5 p.m. on the 11th of March. Officers Parra and Segroves wore plain clothes on that day.

Officer Parra denied hitting defendant with a telephone book or having seen any other officer hitting defendant. After Parra testified, defendant resumed the stand and identified Parra as the one who hit him with the telephone book. He said that the blond man was present and was handling a shotgun. Officers Parra, Segroves and Doyle all denied hitting defendant or using any threats or actual force.

Officer Segroves testified at trial that after participating in the arrest of defendant, he obtained a consent-to-search form and went to defendant's home to search for a black Ninja suit allegedly worn during the robbery. He returned to the station at about 5:30 or 6 p.m. Officer Doyle testified that Officers Segroves, Parra and Pena went together to execute the search of defendant's home.

At the conclusion of the suppression hearing, the trial court denied the motion to suppress, after making findings and rulings that: (a) defendant was arrested on March 11, 1986, and was advised of the *Miranda* warnings (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602); (b) defendant was able to understand the *Miranda* warnings; (c) no credible evidence supported the allegation that defendant was hit with a telephone book by Officer Parra; (d) there was no credible evidence of a coerced statement; and (e) no credible evidence of a violation of any of defendant's rights under the fourth or sixth amendments (which were boilerplate claims in the written motion to suppress but which were never pressed at the hearing).

■■ ■ Before considering whether the trial court's initial ruling was correct, we will review the basic governing principles of law. Section 114—11(d) of the Illinois Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 114—11(d)), requires that:

> "The burden of going forward with the evidence and the burden of proving that a confession was voluntary shall be on the State. Objection to the failure of the State to call all material witnesses on the issue of whether the confession was voluntary must be made in the trial court." (Ill. Rev. Stat. 1989, ch. 38, par. 114—11(d).)

Under the above-quoted statute, where the voluntary nature of a confession is in issue, the State must prove that the confession was voluntarily made, by a preponderance of the evidence. (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601.) In addition, the State must produce all material witnesses connected with the taking of the statement or explain their absence. (*In re Lamb* (1975), 61 Ill. 2d 383, 389, 336 N.E.2d 753; *People v. Armstrong* (1972), 51 Ill. 2d 471, 476, 282 N.E.2d 712, 715; *People v. Jones* (1990), 196 Ill. App. 3d 937, 958, 554 N.E.2d 516.) The purpose of the rule is to compel the State to produce those officers who were witnesses to, or who had a role in procuring, the making of the controverted statement. (*People v. Jones*, 196 Ill. App. 3d at 958-59, 554 N.E.2d at 529.) The rule is intended as a safeguard against improperly induced confessions. (*People v. Bell* (1977), 50 Ill. App. 3d 82, 86-87, 365 N.E.2d 203.) A police officer's testimony is material to the issue of the voluntariness of a confession where the

defendant alleges he has been beaten at arrest (or prior to confessing), whether or not the officer is present at the time the confession is made. *People v. Lumpp* (1983), 113 Ill. App. 3d 694, 699, 447 N.E.2d 963; *People v. Lewis* (1979), 75 Ill. App. 3d 259, 279, 393 N.E.2d 1098. See also *People v. Armstrong*, 51 Ill. 2d at 476, 282 N.E.2d at 715; *People v. Delk* (1976), 36 Ill. App. 3d 1027, 1035, 345 N.E.2d 197.

## A

We turn our attention first to the trial court's initial ruling denying defendant's motion to strike Detective Leuser's testimony for failure of the State to produce all of the material witnesses at the initial stage of the hearing.

When Leuser completed his testimony on November 17, the initial hearing date, the State declared that it had established a *prima facie* case of voluntariness and that its burden of producing evidence had been met. The State further argued that there was no evidence of coercion shown. Defense counsel objected that not all of the material witnesses had been produced, reading from police reports the names of the arresting officers Segroves and Parra, and asserting that the People had not met their burden of proof in the absence of the officers. Defendant cited *People v. Lewis* (1979), 75 Ill. App. 3d 259, 393 N.E.2d 1098. In *Lewis*, three out of four material witnesses did testify at the suppression hearing. The absence of the fourth was held to be adequately explained.

The trial court opined that the rule cited by defense counsel was not "iron clad" and that it understood the law to be that once a *prima facie* case is established by the People, the trial court has discretion to rule on the ultimate question of voluntariness without hearing from additional witnesses. Then, if at trial, the additional witnesses are later produced, there will be a record available for a reviewing court to back up the initial ruling or determine that the People had not, in fact, met their burden of proof. The trial court then ruled that a *prima facie* case had been established. Based on the content of the written statement to Gerber, in which defendant allegedly stated that no force or threats were used against him, the trial court denied defendant's motion to strike the confession. It is apparently from this ruling that defendant appeals. We will review this ruling without regard to the plain error rule (134 Ill. 2d R. 615).

We conclude that the trial court should not have the discretionary authority to dispense with the material witness rule after a *prima facie* case is made as to voluntariness, in anticipation that missing material witnesses will be produced at the trial. We recognize,

however, that there is authority supporting the trial judge's initial ruling. In *People v. Cukojevic* (1981), 103 Ill. App. 3d 711, 719 n.2, 431 N.E.2d 1154, 1161 n.2, this court reviewed the general rule that the State must produce all material witnesses connected with the taking of a statement or explain their absence. In footnote 2, this court "glossed" the material witness rule with a veneer of judicial discretion. We said:

> "If a trial judge is satisfied that a confession is voluntary, it is within his discretion not to require that all material witnesses be called. Such a decision by the trial judge will not be reversed absent a clear abuse of discretion. See *People v. Terrell* (1974), 18 Ill. App. 3d 911, 914, 310 N.E.2d 791, 794, *aff'd* (1975), 62 Ill. 2d 60, 338 N.E.2d 383." (*People v. Cukojevic*, 103 Ill. App. 3d at 719 n.2, 431 N.E.2d at 1161 n.2.)

The trial judge's ruling appears to rely on the *Terrell* case, cited in the *Cukojevic* footnote quoted above. However, we find the authority to be suspect. Having reviewed the opinions in *People v. Terrell*, both in this court and in the supreme court, we must note that that case did not involve a pretrial suppression motion. Defendant Terrell objected at trial to having his confession read to the jury on the ground that not all of the witnesses to it had been called. Defense counsel admitted that, for reasons of strategy, he made no motion to strike the confession. Apparently, counsel was not objecting to the admissibility of the confession but did not want it read to the jury before the defendant testified. The trial court indicated that it would suspend trial and hold a voluntariness hearing "but there is no motion before me." When defendant testified, he placed before the court facts which would support his claim of coercion. Under such circumstances, our supreme court held that the error, if any, in failing to produce the two missing witnesses to the confession had been waived. *People v. Terrell*, 62 Ill. 2d at 63, 338 N.E.2d at 384.

Our supreme court did affirm this court's ruling that the confession in *Terrell* was admissible, but it did not affirm our reasoning. This court held that the confession was voluntary and distinguished *People v. Armstrong* (51 Ill. 2d 471, 282 N.E.2d 712). We held that the trial judge was in a position to view the demeanor of the witnesses and was satisfied that the confession was not coerced. It is evident that where our supreme court has held that defendant waived a claim under section 114—11(d) and has affirmed our court's affirmance of the trial court's admission of the confession, but on a different ground than waiver, the supreme court has merely affirmed our judgment, and not the reasoning of our opinion.

In our opinion in *Terrell*, we quoted language from the concurring opinion in *People v. Sims* (1961), 21 Ill. 2d 425, 434, 173 N.E.2d 494, 498, by Justice House, joined by two other justices. That language we now quote:

"Whether an absent witness to a confession could be of substantial value in resolving the question of voluntariness of a confession must be weighed by the trial judge against the credibility of testimony already elicited from other witnesses. 'If, in order to satisfy himself of the competency of a confession, he requires all of the material witnesses to be called, he should do so. On the other hand, if he were satisfied to hear less than all of such witnesses, that also should be within his discretionary power, and we should reverse only where we are satisfied that there was a clear abuse of discretion.' *People v. Sims* [citation]." (*Terrell*, 18 Ill. App. 3d at 914.)

It ought to be acknowledged by our court that Justice House's rule in *People v. Sims* differs from the rule stated by the majority of the supreme court. In *Sims*, six officers testified at a pretrial hearing but a seventh officer, Golden, did not. Officer Golden was not present at the allegedly coercive acts testified to by the defendant. The six officers who did testify denied any coercion had been used to get Sims to confess. The rule followed by the majority in *People v. Sims* was a rule of materiality. The court, speaking through Justice Hershey, reviewed numerous cases and then stated the rule as follows:

"The principle that emerges clearly from all these cases is that the persons who must be called as witnesses or whose absence must be explained are those persons whose testimony would be material on the issue of the voluntary nature of the confession. It is in the light of this principle that defendant's contention must be examined." (*People v. Sims*, 21 Ill. 2d at 432, 173 N.E.2d at 497.)

Applying the principle of materiality to the facts of that case, the court held that Officer Golden was not a material witness. Therefore the rule requiring the production of all witnesses was not violated. (*People v. Sims*, 21 Ill. 2d at 433, 173 N.E.2d at 498.) Thus, by a 4-3 majority, the Illinois Supreme Court adopted a rule that is at odds with that espoused by the special concurring opinion.

We believe that the majority in *Sims* extensively analyzed prior case law and adopted the rule of materiality in order to avoid exactly the kind of mechanical, automatic reversal-type of rule that Justice House opposed. We note that Justice Hershey had joined in an earlier opinion criticizing the mechanical rule (*People v. Dale* (1960), 20 Ill. 2d

532, 171 N.E.2d 1), as acknowledged by Justice House's concurring opinion.

It now appears to us that the rule espoused by Justice House in *Sims* is too flexible to be serviceable, and we announce our abandonment of any allegiance to it. First, the statutory section under review, section 114—11(d), serves an important ancillary purpose by buttressing procedurally the constitutional goals announced in *Jackson v. Denno* (1964), 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (held that as a matter of due process, the issue of voluntariness of a confession is to be decided by trial judge outside of the presence of the jury). In *Jackson v. Denno*, the Supreme Court also recognized as "axiomatic" that the due process clause is violated when a criminal conviction rests, in whole or in part, on an involuntary confession, without regard to its truthfulness or falsity and that at some stage of the proceedings the accused is entitled to have a fair hearing on the issue of voluntariness. (378 U.S. at 376-77, 12 L. Ed. 2d at 915-16, 84 S. Ct. at 1780-81.) The court further recognized that the determination of voluntariness is "an exceedingly sensitive task" (378 U.S. at 390, 12 L. Ed. 2d at 923, 84 S. Ct. at 1788). Appellate review is an inadequate substitute for a full and reliable determination of the issue of voluntariness by the trial court. Thus, trial court procedures must be "fully adequate to insure a reliable and clear-cut determination of the voluntariness of the confession, including the resolution of the disputed facts upon which the voluntariness issue may depend." (378 U.S. at 391, 12 L. Ed. 2d at 924, 84 S. Ct. at 1788.) A proper determination of the voluntariness issue prior to the admission of the confession at trial is both practical and desirable (378 U.S. at 395, 12 L. Ed. 2d at 926, 84 S. Ct. at 1790-91).

While a pretrial evidentiary hearing may not be required in every case by constitutional mandate (*In re L.F.* (1983), 119 Ill. App. 3d 406, 417, 456 N.E.2d 646), Illinois has made pretrial evidentiary hearings available, by statute, to challenge the admissibility of assertedly involuntary confessions. (Ill. Rev. Stat. 1985, ch. 38, par. 114—11(a).) The purpose of such hearings is to afford the defendant a searching inquiry into the circumstances surrounding the confession, and only a complete record affords adequate protection of the integrity of that decision-making process. (See *People v. Sims* (1988), 165 Ill. App. 3d 204, 207, 518 N.E.2d 730.) An inadequate inquiry into the circumstances of the confession risks the intolerable result that involuntary confessions will be admitted at trial. While pretrial hearings are only one safeguard against this risk, they are the preferred method of resolving the issue of voluntariness. From a judicial economy standpoint, mid-trial voluntariness hearings consume valuable trial time. If a perfunctory

pretrial hearing results in the confession being placed before the fact finder while the ultimate decision on voluntariness is left to the reviewing court on the trial record, the cost of the error is retrial. Such retrials could be avoided if the issue of voluntariness is resolved on a complete record in the trial court prior to trial. From a fairness standpoint, it seems obvious to us that a defendant is more likely to believe that he or she has had his or her day in court if there is a complete hearing in the trial court before trial.

We do not criticize the trial judge for initially following our prior opinions and deciding that, on the basis of one witness, he would deny the defense motion to strike the confession, essentially determining the confession voluntary unless the trial evidence showed otherwise. But this court can no longer accept the extremely relaxed interpretation of the material witness rule found in the concurring opinion in *People v. Sims* (1961), 21 Ill. 2d 425, 173 N.E.2d 494. There is little additional cost in following the rule of materiality that the *Sims* majority announced. In the case at bar, after all, the suppression hearing was continued and additional witnesses were called to testify. The result is that most of the material witnesses did testify, as we discuss below, and the reviewing court's task is basically to determine whether a material witness was missing. Finally, the remedy for any error in omitting a material witness does not necessarily require reversal and a new trial. Where appropriate, the case may be remanded for a new or reopened suppression hearing at which the missing witness can be produced or his or her absence explained. If, after the hearing, the confession is ruled not to have been voluntary, a new trial can be granted at that point. See *People v. Lumpp* (1983), 113 Ill. App. 3d 694, 447 N.E.2d 963; *People v. Carr* (1987), 168 Ill. App. 3d 669, 671-72, 523 N.E.2d 393; *People v. Feagans* (1985), 134 Ill. App. 3d 252, 257, 480 N.E.2d 153 (*Feagans II*); *People v. Feagans* (1983), 118 Ill. App. 3d 991, 455 N.E.2d 871 (*Feagans I*); *People v. Tucker-El* (1984), 123 Ill. App. 3d 955, 959, 463 N.E.2d 991.

We hold that, where defendant objected at the suppression hearing to the absence of the allegedly material witnesses, the trial court abused its discretion to the extent that it decided the *prima facie* proof question independently of inquiring as to the existence and identity of any additional material witnesses. We further hold that the trial court abused its discretion by allowing the State to meet its burden of production without any explanation for the absence of the missing material witnesses. Finally, we disapprove of the practice of deferring the testimony of material witnesses until the trial as a convenience to the trial court. If the defendant has objected to the absence of the wit-

nesses, and the trial court determines that they are material, they should be heard at the suppression hearing, or an explanation for their absence should be presented. In short, once the defendant places in issue the voluntariness of his confession, the trial court should make as complete a record as reasonably possible of the testimony of witnesses who are material to the voluntariness inquiry. We are fortified in our view of the material witness rule by the trial record in this case, where one of the missing arresting officers, Officer Pena, never testified at the trial. If the trial testimony was thought to be a safeguard against an erroneous voluntariness ruling, it wholly failed as to Officer Pena.

We conclude, however, that while there was an abuse of discretion in the initial ruling, the hearing was continued. Therefore, we cannot fully review the trial court's actions without reviewing the balance of the hearing. We now turn to the continued suppression hearing.

## B

Having determined the initial ruling of the trial court was an abuse of discretion, this court hastens to commend the trial court for continuing the suppression hearing beyond November 17, 1986, so that the People could produce additional material witnesses. This court now will determine whether the failure of the People to produce or explain the absence of Officers Doyle and Pena at the suppression hearing constitutes a violation of the statutory requirement that the People produce all material witnesses on the issue of whether the defendant's statement was voluntary.

We observe that defendant's written motion for new trial focused on the initial trial court ruling. Defendant's motion states that: "The Court erred in overruling defendant's Motion to Suppress the Alleged Statement of the defendant. We call the court's attention to pages 20 to 25, inclusive, of the transcript of proceedings of November 17, 1986." Because this motion for new trial preserved only the challenge to the initial ruling by the trial judge, which we reviewed above, this court will conduct only a limited, plain error review of the remaining questions raised by the absence of Officers Doyle and Pena at the suppression hearing or the trial. *People v. Terrell*, 132 Ill. 2d at 202, 547 N.E.2d at 152-53.

■ It is our view that Officer Doyle is not a material witness. According to defendant's own testimony, she was not one of the officers present when he was allegedly hit by a telephone book. While at one point defendant testified that there were four officers in the room when he got hit, he never mentioned a female officer. Further, it is clear that defend-

ant ultimately alleged that Parra hit him with a telephone book in the presence of a blond male officer who handled a shotgun.

Conversely, Officer Doyle testified at trial that she was present with defendant from the time of his booking until his statement to Attorney Gerber and that she saw no force used against him. Therefore, it is this court's view that, even assuming Officer Doyle is a material witness, her testimony would be cumulative to the testimony of Officers Parra and Segroves. (See *People v. Veal* (1986), 149 Ill. App. 3d 619, 625, 500 N.E.2d 1014 (where officer alleged to have made promise of leniency testifies at hearing, second officer's nonproduction not material where no evidence his testimony would have differed); see also *People v. Boyd* (1980), 88 Ill. App. 3d 825, 847, 410 N.E.2d 931 (no evidence missing officers' testimony would have differed from that of officers who did testify).) We therefore hold that it was not error for the People to fail to produce Officer Doyle, or explain her absence, from the suppression hearing.

The final missing witness is Officer Pena. Although Officer Pena never testified at the suppression hearing or at the trial, his activities at the time of defendant's arrest and immediately following were described by the trial testimony of Officer Segroves. We note that as a general rule we are authorized to review the trial testimony to determine whether the State has met its burden of proof. (*People v. Allen* (1986), 148 Ill. App. 3d 200, 203-04, 498 N.E.2d 838.) We further note that defendant was arrested at about 4 p.m. and was interviewed by Detective Leuser at about 5 or 5:30 p.m. According to defendant, he was struck with a telephone book at about 20 minutes before his interview with Leuser. Therefore, the relevant time period for the alleged incident of coercion would be at about 4:40 to 5:10 p.m. Testimony at trial placed Officer Pena at the relevant time period as executing the consent to search form defendant had signed, together with Officers Segroves and Parra. Officer Segroves testified that, after seizing the Ninja suit, he, Parra, and Pena only returned to the Tenth District at about 5:30 or 6 p.m. Based on Officer Segroves' trial testimony, Officer Pena would not have been present at the station house at the relevant time and therefore could not be a material witness. (See *People v. Colson* (1989), 187 Ill. App. 3d 423, 432, 543 N.E.2d 282.) Therefore, we conclude that Officer Pena's absence from the trial or the suppression hearing is not error requiring reversal of defendant's conviction. The criterion for application of the plain error test is whether the evidence is closely balanced or whether the claimed error is of such magnitude that the defendant was denied a fair and impartial trial. (*People v. Gacy* (1984), 103 Ill. 2d 1, 468 N.E.2d 1171; *People v. Watts* (1990), 195

Ill. App. 3d 899, 913, 552 N.E.2d 1048, 1057.) This court cannot conclude that the People's failure to produce Officer Pena or explain his absence at the suppression hearing or trial is of such magnitude that it denied defendant a fair and impartial trial. Nor can we say that the evidence is closely balanced. Therefore, we decline to find plain error in the admission at trial of defendant's confession.

### III

In his third issue defendant contends that the trial court erred by allowing jury instruction No. 12, Illinois Pattern Jury Instructions, Criminal, No. 14.02 (2d ed. 1981) (hereinafter IPI Criminal 2d) (armed robbery—issues instruction) to be submitted. He claims the instruction led to a general verdict from which it was impossible to determine what evidence the conviction rested upon. This, in turn, is reversible error, defendant argues, because the evidence is insufficient to support at least one, and alternatively, both, of the armed robbery counts.

Defendant and his codefendant Pedro Lopez were indicted on four counts involving two victims: Mary Lou Castro and Luis Reyes. For each victim there was one count of armed robbery and one count of armed violence. The armed robbery counts generally alleged that money was taken from the person and presence of each of the separate victims. Mary Lou Castro did not testify at trial, but Luis Reyes did.

At a conference on jury instructions the two assistant State's Attorneys observed that they would be requesting a single verdict (two forms—guilty or not guilty) for armed robbery. However, there were two counts of armed robbery in a factual situation involving a taking of money from the bar's cash register in the presence of the two named victims. It was requested that IPI Criminal 2d No. 14.02, the issues instruction for armed robbery, be worded such that both victims were included in a single-form count. The instruction would state, in part, that money was taken "from the person or presence of Mary Lou Castro *or* Louis Reyes."

Defense counsel objected, arguing that the instruction, as worded, might confuse the jury. Defendant also argued that Castro had not testified, although he conceded there was testimony stating that she had been present in the tavern, so the prosecution should not have the benefit of an instruction on her count. The State's Attorney argued that an inconsistent verdict might be a problem. The trial court rejected naming Reyes and Castro in the conjunctive. The court opined that the safest course would be to state the instruction in the disjunctive because of the testimony that Castro was present. The State's Attorney

then withdrew the alternative forms, Nos. 13 and 14. There was no objection to the verdict forms.

In the instructions actually read to the jury, however, the trial court used the conjunctive form, stating that the jury must find "that the defendant *** took United States Currency from the persons or presence of Mary Lou Castro *and* Luis Reyes." (Emphasis added.) The trial court further instructed the jury on the two forms of the verdict. The jury was required to return a verdict of guilty or not guilty of armed robbery, without specifying the victim. When the jury returned its verdict it found defendant "guilty of the offense of armed robbery." The jury was then polled. Subsequently, at sentencing, the trial court merged the two armed robbery counts, evidently being confused by the original indictment that had charged four counts. The trial court declared the convictions merged and the remaining conviction would be for the armed robbery of Mary Lou Castro, based on the assistant State's Attorney's representation that the testimony showed her to be the bar maid who was behind the bar at the time of the robbery of money from the cash register.

Defendant misreads the record and formulates his present claim of error on the mistaken view that the jury was instructed to assess whether there was a taking from the person or presence of Mary Lou Castro *or* Luis Reyes. Actually, and as previously noted, the jury was instructed that it could convict if it found that there was a taking from the person or presence of Castro *and* Reyes. While we doubt that this issue has been preserved by the language in the motion for new trial, that "The verdict is based on evidentiary facts which do not exclude every reasonable hypothesis consistent with the innocence of the defendant," we will review defendant's claims on the merits.

■■ The instruction as given conformed to the indictment but called for a general verdict. The rule governing general verdicts is that: " '[w]here an indictment contains several counts arising out of a single transaction, and a general verdict is returned, the effect is that the defendant is guilty as charged in each count, and if the punishment imposed is one which is authorized to be inflicted for the offense charged in any one or more of the counts, the verdict must be sustained.' (*People v. Lymore* (1962), 25 Ill. 2d 305, 308[, 185 N.E.2d 158].)" *People v. Thompkins* (1988), 121 Ill. 2d 401, 455-56, 521 N.E.2d 38.

In *Thompkins*, the jury was instructed as to three forms of murder but returned a general verdict. Defendant argued that the verdict did not support a conclusion that he committed intentional murder and, therefore, that he should not have been deemed eligible for the death

penalty. The supreme court disagreed, quoting *People v. Lymore*, and held that the general verdict raised a presumption that the jury had found defendant guilty of intentionally murdering both victims.

In *People v. Brackett* (1987), 117 Ill. 2d 170, 179, 510 N.E.2d 877, where defendant was convicted of a general verdict, the supreme court said that a general verdict "means he is guilty of any good count in the indictment to which the proof is applicable." See also *People v. Jones* (1975), 60 Ill. 2d 300, 309, 325 N.E.2d 601.

In *People v. Lloyd* (1981), 93 Ill. App. 3d 1018, 418 N.E.2d 131, the jury was provided two verdict forms for each defendant. Each form named all three victims of the armed robbery. The defendants claimed on appeal that the indictment had charged three separate counts and, therefore, the jury must return a general verdict on each of the three and not one general verdict on a single count naming all three victims. This court rejected defendants' claims, citing the general verdict rule and *People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601. This court stated that "when a general verdict of guilty is returned on an indictment which contains several counts arising out of the same transaction, the defendant is considered guilty on each count." *People v. Lloyd*, 93 Ill. App. 3d at 1027, 418 N.E.2d at 137-38.

In the case at bar, the jury instruction was actually in the conjunctive and not in the disjunctive, as defendant claims, and the general verdict returned must be presumed to be a conviction as to both the Luis Reyes count and the Mary Lou Castro count. For this reason, we find inapplicable the cases cited by defendant. (*United States v. Berardi* (7th Cir. 1982), 675 F.2d 894, 902-05; *United States v. Talkington* (9th Cir. 1978), 589 F.2d 415; *cf. United States v. Beverly* (7th Cir. 1990), 913 F.2d 337, 361-65.) We find those cases inapplicable even assuming, for the sake of argument, that the evidence is insufficient to support a conviction beyond a reasonable doubt as to the Mary Lou Castro count, because Illinois law presumes the verdict to have been based on the Reyes count, for which we believe the evidence was sufficient, for reasons we explain below. Finally, we believe the trial court's merger of what it thought were two counts is of no consequence. The jury returned a general verdict. The trial court's housekeeping measure at sentencing was a well-intended misapprehension of the record. Therefore, we reject defendant's third issue. We fail to see how defendant was prejudiced when he was convicted of and sentenced for one count of armed robbery despite the jury having convicted him of two armed robbery counts.

IV

Defendant next contends that the evidence was insufficient to prove his guilt beyond a reasonable doubt. When a reviewing court is asked to determine the sufficiency of the evidence, it must decide whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453; *People v. Reid* (1990), 136 Ill. 2d 27, 60-61, 554 N.E.2d 174.) In addition, we must remember that the jury saw and heard the testimony and was in the best position to judge the credibility of the witnesses and to determine the weight to be accorded their testimony, and to resolve any conflicts in the evidence (*People v. Young*, 128 Ill. 2d at 51, 538 N.E.2d at 473; *People v. Reid*, 136 Ill. at 61, 554 N.E.2d at 190). A reviewing court must not substitute its judgment for that of the trier of fact on those issues and should not reverse a conviction "unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." (Emphasis omitted.) *People v. Young*, 128 Ill. 2d at 51, 538 N.E.2d at 474; *People v. Reid*, 136 Ill. 2d at 61, 554 N.E.2d at 190.

 Defendant complains that there was no positive identification of him as one of the robbers and no independent corroboration of his confession. We agree with the People that the evidence in this case produced a reasonable certainty that the defendant committed the crime of armed robbery.

The defendant consented to a search of his house for a black Ninja suit, such as was worn by the robbers. Defendant, in his confession, identified the shotgun as the one used in the robbery. Both in his statement to Officer Segroves and in his trial testimony, defendant described his codefendant, Pedro Lopez, by his street name, "Chocolate." Marco Arc testified that he gave the shotgun to Pedro on March 8, 1986, and retrieved the gun the next day, placing it under his bed, until he gave it to the police. Arc knew that Pedro and "Chocolate" were the same person. In his confession defendant related how he and his codefendant carried a shotgun into the bar and robbed it.

The robbers had one shotgun and one pistol between them. The robbers spoke Spanish. One of the robbers was described as being a little shorter than Luis Reyes, who testified that he was 5 feet 6 inches tall. The other robber was described as being shorter yet.

There are discrepancies within the confession as to certain details of the offense. But the *corpus delicti* is established by the testimony of Luis Reyes and Rosa Rodriguez, and the inconsistencies in their version and defendant's confession go to the weight of the evidence. *People v. Lambert* (1984), 104 Ill. 2d 375, 472 N.E.2d 427.

In short, we conclude that given the defendant's confession and the remaining evidence, we cannot say that a rational fact finder could not have found the elements of the crimes beyond a reasonable doubt.

## V

In his final issue, defendant argues that his sentence of 12 years must be vacated as being grossly disparate from the seven-year sentence imposed on his codefendant, Pedro Lopez. Defendant contends that he was punished for electing a jury trial where Lopez was rewarded for pleading guilty. Defendant additionally complains that both he and Lopez are similar in age and background. Both are relatively youthful offenders (defendant was 19 years of age and Lopez 17 years of age at the time of sentencing). Both have similar prior criminal records (defendant and Lopez had no adult convictions; defendant had three arrests stricken off call, with leave given to reinstate, while Lopez had one). According to defendant, his conduct during the offense was less culpable than that of Lopez who, defendant asserts, wielded the shotgun during the robbery.

The sentencing court, noting that defendant was only 19 and lacked a substantial criminal history, opined that defendant had committed perjury at trial and at the suppression hearing. In addition, the court observed that the shotgun in question was a dangerous weapon which had been adapted to fire easily, based upon the guilty plea of Lopez. The court further stated that the shotgun was fired, but that it was not known which defendant had fired it. However, the court said that "the evidence would suggest that the weapon that was discharged was in the person and presence of Mr. Ralon." While both defendants threatened serious harm to society, Lopez's guilty plea was deemed "the first step in the way to rehabilitation, he took his medication like a man and went along his way." The court denied that it was imposing a 12-year sentence on defendant because he exercised his right to trial by jury or other procedural rights. The sentencing court opined that the robbery was well planned and threatened serious harm and thus the 12-year sentence was justified.

Defendant relies upon *People v. Steg* (1966), 69 Ill. App. 2d 188, 192, 215 N.E.2d 854, 856, for the proposition that a sentence which arbitrarily imposes a greater punishment or penalty upon one or more

of the co-participants in a crime should not be approved, unless there is a basis in the records of the individuals involved or in the nature of the participation of such individuals in the crime which would justify a more severe sentence as to one of the equal participants. Defendant then argues that the facts of the present case fall within the rule of *People v. Steg*. We note that a defendant who contends his sentence is inappropriately disparate bears the burden of producing a record upon which a rational comparison can be made. (*People v. Kline* (1982), 92 Ill. 2d 490, 509, 442 N.E.2d 154.) Defendant has met that burden here.

The People argue that where the statutory range of sentences is 6 to 30 years, a 12-year sentence is not arbitrary. In addition, the 12-year sentence in this case is justified, the People argue, because the robbery was well planned and defendant inflicted a high degree of danger upon the patrons of the tavern by firing two gunshots. The People admit that "defendant and or his co-defendant fired two shots." (People's brief at 33.) However, this court observes that at the sentencing, the assistant State's Attorney stated that Pedro Lopez fired the shotgun into the ceiling of the tavern, and later stated that defendant had been convicted of a Class X offense "and I dare say a Class X offense that, that is probably the most aggravating of all, using a deadly weapon and in fact discharging that weapon, threatening these people in the tavern." Finally, the People assert that defendant lied throughout the proceedings, showed no remorse, and failed to acknowledge that he did anything wrong. The People requested the maximum penalty.

We begin with the threshold question whether a differential of five years amounts to a gross disparity in sentences for a Class X felony of armed robbery, where the statutory range is 6 to 30 years. In *People v. Williams* (1989), 180 Ill. App. 3d 294, 305-06, 535 N.E.2d 993, we considered a claim that an 11-year sentence for robbery, home invasion and aggravated battery, with sentencing on home invasion, was grossly disparate from a codefendant's six-year sentence. The offense of home invasion is a Class X felony with a statutory range of 6 to 30 years' imprisonment. Defendant Williams argued that because he had no prior record of convictions and was 24 years of age, his 11-year sentence was excessive and was punishment for electing a jury trial, where his codefendant had pleaded guilty and had received a six-year sentence. We held the excessive sentence claim waived and the disparate sentence not an abuse of discretion. We noted, first, that the disparity "was only five years" and, second, that the evidence showed defendant Williams to have been the robber who was the most aggressive, the one who went through the victim's pockets and threatened to

blow his head off. Under these circumstances, we found the disparity supported by the evidence.

For purposes of the present case, we agree with *Williams* that a five-year disparity in sentences may qualify for analysis as a gross disparity even where the sentences are within the statutory range. In addition, we note that in *People v. Steg*, the disparity was three years for the minimum and 10 years for the maximim, as one defendant was sentenced to a 2- to 10-year indeterminate sentence and the other two were sentenced to a 5- to 20-year term.

The general rule which governs our decision is that each defendant is to be sentenced as an individual. When fashioning a proper penalty, the trial court may consider the degree of each defendant's participation in the offense and recognize the differences in the defendants' rehabilitative potential, backgrounds and criminal records. However, a reviewing court should give great weight to the judgment of the sentencing court and, absent a clear showing of an abuse of discretion, the trial court's sentence may not be altered. (*People v. Smith* (1990), 199 Ill. App. 3d 839, 859, 557 N.E.2d 596.) While great deference must be accorded a trial judge's sentencing decision (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882), there can be no such deference where an arbitrary and unreasonable sentencing disparity exists between equally culpable codefendants. *People v. Ashford* (1988), 121 Ill. 2d 55, 88, 520 N.E.2d 332.

Although an arbitrary and unreasonable disparity between the sentences of codefendants who are similarly situated is impermissible, the mere fact that one defendant receives a substantially longer sentence does not, by itself, establish a violation of fundamental fairness. (*People v. Centanni* (1987), 164 Ill. App. 3d 480, 493, 517 N.E.2d 1207; *People v. Kline* (1982), 92 Ill. 2d 490, 508, 442 N.E.2d 154, 162; *People v. Godinez* (1982), 91 Ill. 2d 47, 55-56, 434 N.E.2d 1121, 1126.) A disparate sentence may be supported by either a more serious criminal record or greater participation in the offense. *People v. Treece* (1987), 159 Ill. App. 3d 397, 418, 511 N.E.2d 1361; *People v. Barfield* (1989), 187 Ill. App. 3d 190, 204-05, 543 N.E.2d 812; *People v. Wooton* (1990), 198 Ill. App. 3d 591, 596-97, 555 N.E.2d 1214.

In the case at bar we must apply these principles even though we note the codefendant, Lopez, pleaded guilty to armed violence, and not armed robbery. Both offenses are a Class X felony. A similar factual occurrence arose in *People v. Godinez*, where a difference in the nature of the felony convictions of the defendant and the codefendant was noted in the special concurring opinion of Justice Simon (*People v. Godinez*, 91 Ill. 2d at 57-58, 434 N.E.2d at 1126).

▉▉ We find that the sentencing court here gave insufficient attention to the factual question of who wielded the shotgun. This court finds there is no evidence in this record that defendant fired the shotgun. Defendant's confession placed the shotgun in the hands of Pedro Lopez. Marco Arc, who testified for the People, gave the shotgun to, and retrieved it from, Pedro Lopez. We are further provided with a transcript of Lopez's guilty plea wherein there is evidence that Lopez fired the shotgun. The People stipulated to this evidence, as to Pedro Lopez only.

Although the sentencing judge had taken the guilty plea from Lopez, wherein Lopez admitted shooting the shotgun, at defendant's sentencing the judge all but assumed defendant was the party who held the shotgun, saying that it was "in the person and presence of Mr. Ralon." Whether this was a cryptic reference to accomplice liability or a plain mistake of fact is open to question. But even where liability is vicarious, sentencing must be based on an assessment of the individual's conduct. We note that where the disparity in sentence results in the higher sentence for the defendant who actually wields the shotgun, we have upheld the higher sentence. See *People v. Reynolds* (1989), 178 Ill. App. 3d 756, 767, 533 N.E.2d 932 (10-year disparity in attempted murder case held justified where first defendant handled shotgun and second did not and third actually shot victim, although second defendant was involved in assault); see also *People v. Ashford*, 121 Ill. 2d at 88-89, 520 N.E.2d at 346.

If we were to view the sentencing judge's discretion based on a single factor of who wielded the shotgun, we would find it difficult to distinguish *People v. Steg* (1966), 69 Ill. App. 2d 188, 215 N.E.2d 854. In *Steg*, the least deserving codefendant, the one who was plainly the instigator and planner of the crime, received the most lenient sentence, 2 to 10 years, while the two more deserving codefendants received the higher sentences, 5 to 20 years (although from a different judge). *Steg* also involved the prior conviction records and pending charges of the codefendants. The codefendant with the worst record and who was facing a pending charge received a lighter sentence than the other codefendants who had better conviction records and no pending charges. By analogy, Lopez was the worst actor in the case at bar because he was plainly the instigator and planner of the robbery and because he wielded the shotgun and fired it twice, and pointed it at the head of Luis Reyes. If the sentencing court was confused as to who wielded the shotgun, it is an injustice which parallels the arbitrary inversion of the sentences in *Steg*.

██ We do not review the sentencing judge's discretion based on a single factor, however. Rather, we look to the entire record in order to determine whether there has been a clear abuse of discretion. (See *People v. Ward* (1986), 113 Ill. 2d 516, 527, 499 N.E.2d 422.) We do not review sentences to mete out judicial clemency. (See *People v. Hamilton* (1987), 155 Ill. App. 3d 555, 562, 508 N.E.2d 385.) In the case at bar the sentencing court also relied on the perception that defendant had committed perjury at least as to the claim of coercion by which he challenged his confession. In general, it is permissible for a court to consider its perception of the defendant's perjury in fixing the penalty to be imposed. *People v. Ward*, 113 Ill. 2d at 528, 499 N.E.2d at 426; *People v. Meeks* (1980), 81 Ill. 2d 524, 536, 411 N.E.2d 9.

We have held that it is proper for a sentencing judge to consider that a defendant has committed perjury at a motion to suppress by claiming that the police beat him while he was in custody and where the defendant denies participating in the offense. (*People v. Sanchez* (1987), 163 Ill. App. 3d 186, 191, 516 N.E.2d 556.) In *Sanchez*, defendant argued that his 10-year sentence was impermissibly disparate from his co-conspirator's four-year sentence. We rejected the claim because of the perjury, the lack of remorse, and the fact that the sentence fell within the statutory range. In *Sanchez* we also noted that it was proper for the sentencing court to afford leniency to the codefendant who had pleaded guilty.

██ A sentencing court also may consider as a factor in imposing sentence the defendant's continued protestation of innocence and his lack of remorse following the determination of guilt. However, these aggravating factors must not be automatically and arbitrarily applied. Rather, the attitude of the defendant must be evaluated in light of all the other information the court has about the defendant, and in light of all the other facts of the case in determining what relevant meaning the defendant's attitude displays with respect to his prospect for rehabilitation and restoration to a useful place in society. *People v. Ward*, 113 Ill. 2d at 529-30, 499 N.E.2d at 426.

In the case at bar, the defendant spoke at sentencing and protested that he had been "railroaded" and that his rights had been violated. Defendant was sentenced one year and three days after the *Ward* decision was released. In similar circumstances, the supreme court in *Ward* held that once the defendant elected to speak and protest his innocence, the sentencing court could "incorporate the legitimate inferences drawn from this assertion, including whether the assertion was truthful, into the balance in considering the relevant

factors bearing on the defendant's character and potential for rehabilitation." 113 Ill. 2d at 532, 499 N.E.2d at 427.

We conclude that, as to the sentencing court's perception that the defendant committed perjury and persisted in protesting his innocence, the court was well within its prerogatives to weigh this factor adversely to defendant. Certainly the sentencing judge was in a better position than we are to judge whether defendant or codefendant Lopez showed remorse. We cannot determine from the record of Lopez's guilty plea and sentencing whether there was a showing of remorse either, but we cannot discern any similar statements by Lopez in that record.

▪ The final factor defendant raises in support of his claim of an improperly disparate sentence is that the sentencing court punished him for electing to go to trial and rewarded Lopez for pleading guilty. It is true that a sentencing judge commits reversible error by punishing a defendant for exercising his right to trial by jury. (*People v. Moriarty* (1962), 25 Ill. 2d 565, 185 N.E.2d 688.) By contrast, where the sentencing court denies imposing sentence as punishment for exercising the right to trial, there is no error. (*People v. Sivels* (1975), 60 Ill. 2d 102, 106, 324 N.E.2d 422.) A similar disclaimer was made in the case at bar. Therefore, we must weigh this factor in favor of the sentencing court.

▪ Defendant asserts, in his reply brief, that "the sentencing court was presented with absolutely no competent [evidence of] aggravation justifying the five year disparity in sentences." We disagree. The sentencing court had sufficient support in the record to explain the five-year disparity in sentences on a basis other than one which can fairly be called arbitrary and capricious. The sentencing court's perception of perjury at the motion to suppress, at trial, and the defendant's persistence in protesting his innocence and that his rights were violated obviously weighed heavily in the sentencing court's mind. Under the circumstances of this case, we cannot say that the sentencing judge abused his discretion in imposing a 12-year sentence on defendant.

For the reasons stated above, the judgment is affirmed.

Affirmed.

MURRAY and GORDON, JJ., concur.